No. 53,000

TAMMY LESTER, a minor, by LINDA LESTER, her mother and next friend, *Appellant-Cross Appellee*, v. MAGIC CHEF, INC., *Appellee-Cross Appellant*.

(641 P.2d 353)

Opinion filed February 27, 1982.

*Jerry R. Palmer,* of Topeka, argued the cause and was on the brief for appellant-cross appellee.

*Thomas L. Theis,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, and *James P. Nordstrom,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause and were on the brief for appellee-cross appellant.

*James M. Armstrong,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, was on the brief for the *amicus curiae* Kansas Association of Defense Counsel.

*Sheila M. Janicke,* of Schnider, Shamberg & May, Chartered, of Shawnee Mission, was on the brief for the *amicus curiae* Kansas Trial Lawyers Association.

The opinion of the court was delivered by

HOLMES, J.: Plaintiff, Tammy Lester, appeals from an adverse

jury verdict in a products liability case. On June 2, 1975, Tammy Lester, two and one-half years old, was seriously burned when she climbed upon a gas stove manufactured by the defendant, Magic Chef, Inc., and located in the mobile home occupied by Tammy and her family. One of the burners on the stove was accidently turned on by Tammy, igniting the garment she was wearing, resulting in severe burns to her upper body and face. Richman Gordman Stores of Kansas, Inc., the seller of the garment worn by Tammy, was also named as a defendant in the original petition filed January 25, 1977. Subsequently an amended petition was filed which named as additional defendants, Roanna Togs, the fabricator of the garment worn by Tammy, and Spring Mills, Inc., the manufacturer of the material used in the garment. On June 18, 1980, a third amended petition was filed in which Magic Chef, Inc. was the sole named defendant. Pursuant to agreement by plaintiff and all of the previously named defendants, the action against Richman Gordman, Roanna Togs and Spring Mills was dismissed.

Eventually the case proceeded to trial against Magic Chef, Inc., on the theories of strict liability in tort and negligence. Basically plaintiff claims defendant was at fault in that the stove was defectively designed, as the controls for the gas burners were not of a self-latching or two-step variety and accordingly could be accidently turned on by a child of tender years. It appears that as Tammy attempted to climb from a chair to the top of the stove, one of the burner controls was accidently turned on and Tammy was immediately engulfed in flames. The case was submitted to the jury under the theory of comparative fault (K.S.A. 60-258a) and the jury returned a verdict for $300,000.00 actual damages and assessed the comparative fault 50% to Melvin Lester, Tammy's father, 50% to her mother, Linda Lester, and 0% to the defendant Magic Chef, Inc. The jury also found that the mobile home manufacturer, Roanna Togs, Richman Gordman, Spring Mills, the mobile home retailer and the gas valve manufacturer were without fault. Numerous points are raised by plaintiff on appeal.

At the outset plaintiff contends it was error to submit the case on the basis of comparative negligence or comparative fault because the plaintiff, due to her tender age, was free of negligence as a matter of law and the legislature, when it enacted K.S.A.

60-258a, did not intend to abolish joint and several liability when there is no fault or negligence on the part of the plaintiff. In the alternative it is argued that it was error to submit the comparative fault of the parents because they were not named parties to the action. This court has now established beyond question that actions based upon strict liability in tort are subject to K.S.A. 60-258a. *Forsythe v. Coats Co.,* 230 Kan. 553, 639 P.2d 43 (1982); *Albertson v. Volkswagenwerk Aktiengesellschaft,* 230 Kan. 368, 634 P.2d 1127 (1981); and *Kennedy v. City of Sawyer,* 228 Kan. 439, 618 P.2d 788 (1980). Plaintiff goes to great lengths to point out the legislative history of the statute and contends that it requires the reversal of our prior opinions beginning with *Brown v. Keill,* 224 Kan. 195, 580 P.2d 867 (1978), and *Miles v. West,* 224 Kan. 284, 580 P.2d 876 (1978), wherein we held that joint and several liability was abolished by the statute and that the comparative fault of all persons and entities contributing to the occurrence, whether named as parties or not, is to be considered in determining the liability of the parties to the action. Without going into detail, suffice it to say, we have carefully considered all of plaintiff's arguments and the legislative history presented and find nothing new or persuasive therein that has not been previously considered by the court in arriving at our earlier decisions.

In *Brown v. Keill* we stated:

"[W]e hold under the provisions of K.S.A. 60-258a the concept of joint and several liability between joint tort-feasors previously existing in this state no longer applies in comparative negligence actions." p. 204.

As recently as October, 1981, we stated in *Albertson,*

"Under the doctrine of comparative fault all parties to an occurrence must have their fault determined in one action, even though some parties cannot be formally joined or held legally responsible." p. 374.

We decline to overrule our previous decisions which, in our opinion, accurately reflect the legislative intent behind K.S.A. 60-258a. If our interpretation of the intent of the legislature is not correct, the legislature has the power to further address the issue.

Next plaintiff alleges it was error to submit the negligence of Tammy's parents to the jury, contending there was insufficient evidence of any breach of duty by the parents, that the instruction on such duty was error and that the jury was allowed to consider evidence of the parents' alleged lack of care of Tammy after the

unfortunate accident. Melvin Lester was not present in the home at the time of the fire and had not been there for several days. Mrs. Lester was in the bathroom at the time Tammy was burned and when she heard her scream, immediately rushed to her and extinguished the flames. Both parents admitted that on several occasions they had accidently turned the burner on by brushing against the control knob. There was some expert testimony that the stove, being several years old, needed repairs and lacked maintenance which, if done, would have made the control more difficult to turn. It was clear that the parents stored cookies above the stove and that Tammy knew where they were stored and was, in fact, attempting to reach the cookies when she climbed upon the stove. Other facts were developed which could also be considered negligence by the parents in the control and supervision of Tammy which if believed by the jury would support the verdict.

The instruction complained of by plaintiff read:

"Parents have a duty to exercise management and control over their children and must exercise reasonable care for their safety and protection. Failure to fulfill this duty constitutes negligence."

The instruction given was not an incorrect statement of the law and although plaintiff objected to the instruction, no requested instruction was presented to the court. Plaintiff now argues that if the court was going to give an instruction it should have been a more detailed and specific one along the lines discussed in *Shirack v. Gage,* 166 Kan. 719, 724, 204 P.2d 587 (1949). The failure of the trial court to instruct more specifically on an issue cannot be assigned as error when no request for such an instruction was made. *Boucher v. Roberts,* 187 Kan. 675, 677, 359 P.2d 830 (1961). We find no error in the giving of the instruction.

Plaintiff also contends it was error to allow the jury to consider the alleged neglect of Tammy by her parents after the accident, which neglect may have accentuated her psychological problems and worsened the permanent disfigurement. The psychological effects and physical disfigurement were asserted by the plaintiff as part of her damages and, being relevant to that issue, we find no error in the admission of the evidence and its consideration by the jury.

Next plaintiff objects to two evidentiary rulings: (1) the admission of certain testimony of Dr. Robert Watkins and (2) the

exclusion of pictures of two other persons who had been burned in similar accidents. Dr. Watkins, a resident in general psychiatry, was allowed, over objection, to testify as to what Tammy told him about the accident even though he did not believe her version of the event and felt it was colored by her fantasies. The doctor's reservations about the accuracy of Tammy's statements were fully brought out on cross-examination and the jury was definitely made aware of them. Plaintiff attempted to introduce pictures of two other individuals who were allegedly burned in similar accidents totally unrelated to the one before the court. The court allowed evidence of the other events on the questions of notice by Magic Chef, Inc., of the alleged design defect in the stove and the possible award of punitive damages. The court declined to admit the pictures showing the extent of the injuries of the victims in the other cases as being overly inflammatory and as not being relevant to the issue of the injuries suffered by Tammy. The evidentiary rulings by the court lie within the discretionary power of the court and we find no abuse of that discretion.

Plaintiff's major point in this appeal is that the court, in instructing the jury on the doctrine of strict liability in tort, failed to give a requested instruction pertaining to the application of the concept of "unreasonably dangerous" to a design defect. ·

It was not until 1976 that this court specifically adopted the doctrine of strict liability. *Brooks v. Dietz,* 218 Kan. 698, 545 P.2d 1104 (1976). In *Brooks* a plumber brought suit against the manufacturer of a gas furnace for injuries received when an explosion occurred as plaintiff was working on the furnace. It was alleged that a defective valve allowed gas to leak from the furnace and resulted in the explosion which seriously injured the plaintiff. After pointing out that this court had never explicitly adopted the doctrine of strict liability in tort the court stated:

"We have concluded the time has come for this court to adopt the rule of strict liability *as set out in § 402A of the Restatement,* supra, and we therefore so hold." p. 702. (Emphasis added.)

Section 402A, Restatement (Second) of the Law of Torts provides:

"§ 402A.  Special Liability of Seller of Product for Physical Harm to User or Consumer.
  "(1) One who sells any product in a defective condition unreasonably danger-

ous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." pp. 347-348.

## Comment *i* to § 402A states, in part:

"The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. . . . The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." p. 352.

## The trial court instructed the jury on strict liability as follows:

"No. 15

"Plaintiff, as one of her claims against the defendant, Magic Chef, relies upon the theory of strict liability. Likewise, defendant Magic Chef as one of its claims contends that the fabric and garment manufacturers and sellers, as well as the mobile home manufacturer and seller, are liable under the theory of strict liability.

"You are instructed that a manufacturer or a seller of a product is at fault under the theory of strict liability, provided you find the following five elements necessary to prove strict liability:

"1. That the manufacturer or seller was engaged in the business of producing or selling a product.

"2. That the product manufactured or sold was in a defective condition and unreasonably dangerous to persons who it was reasonably foreseeable would use the product.

"3. That the product was in a defective condition at the time it left the control of the manufacturer or seller.

"4. That the product was expected to reach and did reach the purchaser without substantial change in the condition in which it was sold.

"5. That the defect in the product caused or contributed to the injuries and damages of plaintiff.

"A manufacturer or seller is at fault although it has exercised all possible care in the preparation and sale of his product and although the user has not bought the product from or entered into any contractual relation with the seller.

"Some of the terms that need to be defined are: 'defective', 'unreasonably dangerous' and 'reasonably foreseeable.'"

"No. 16

"A product is in a 'defective' condition when at the time it leaves the manufacturer or seller's hands, it is unsafe when used for a purpose for which it was intended or for a purpose it was reasonably foreseeable it may be used. A defect may arise from the design of a product.

"No. 17

"For a use to be 'reasonably foreseeable' it must be a use which is objectively reasonable to expect, not merely one that might conceivably occur.

"No. 18

"A product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

Plaintiff objects to instruction No. 18 which is based upon Comment *i* to § 402A and which has come to be known as the consumer expectation test. PIK Civ. 2d recommends:

"PIK 13.21 SPECIAL LIABILITY OF MANUFACTURER OR SELLER OF PRODUCT TO USER OR CONSUMER—STRICT LIABILITY

"A (manufacturer) (seller) who sells a product in a defective condition unreasonably dangerous to the (user) (consumer) is subject to liability for physical harm (or property damage) thereby caused to the ultimate (user) (consumer), if

(1) The (manufacturer) (seller) is in the business of (making) (selling) such a product; and

(2) It is expected that the product will reach and does reach the (user) (consumer) without substantial change in the condition in which it is sold.

"This rule applies although the (manufacturer) (seller) has exercised all possible care in the preparation and sale of his product and although the (user) (consumer) has not bought the property from or entered into any contractual relation with the seller.

"A product is in a defective condition if, at the time it leaves the (manufacturer's) (seller's) hands, it is in a condition which is unreasonably dangerous to the ordinary user.

"*A condition is unreasonably dangerous if it is dangerous when used in the way it is ordinarily used considering the product's characteristics and common usage.* (Emphasis added.)

"The defect may be (in the product's preparation) (in the product's container or packaging) (in the instructions or warning necessary for the product's safe use).

"PIK 13.22. PRODUCTS LIABILITY—STRICT LIABILITY—ISSUE INSTRUCTION.

"The plaintiff . . . is entitled to recover from the defendant . . . for his injuries provided you find the following from the evidence:

"(1) The defendant . . . is engaged in the business of (manufacturing) (selling) a product (describe here the product claimed to be defective).

"(2) The product was in a defective condition unreasonably dangerous to persons who might be expected to use the product.

"(3) The product was in a defective condition at the time it left the control of the defendant . . . .

"(4) The product was expected to reach and did reach the hands of the plaintiff without substantial change in the condition in which it was (manufactured) (sold).

"(5) The defect in the product was the cause or contributed to cause plaintiff's injuries and damages."

Instruction No. 15 given by the court covers all of the require-

ments set forth in PIK Civ. 2d 13.22 and portions of 13.21. When read in conjunction with the other instructions plaintiff concedes that the instructions as a whole substantially comply with the two recommended PIK instructions. Plaintiff, however, takes issue with both the use of the term "unreasonably dangerous" and the definition thereof as set forth in PIK Civ. 2d 13.21 and the court's instruction No. 18. Plaintiff submitted a requested instruction in the following form:

"A manufacturer who sells a product in a defective condition is subject to liability for physical harm thereby caused to the ultimate user if: (1) the manufacturer is in the business of making such a product; and (2) it is expected that the product will reach and does reach the consumer without substantial change in the condition in which it is sold. This rule applies although the manufacturer has exercised all possible care in the preparation and sale of his product and although the consumer has not bought the property from or entered into any contractual relations with the seller. A product is in a defective condition if by either one of the following tests the product design is found to be defective: (a) Consumer Expectation Test: A product is in a defective condition if it is dangerous when used in the way it is ordinarily used considering the product's characteristics and common usage; (b) Excessive Preventable Danger Test: A product is defectively designed if the gravity of the danger embodies excessive preventable danger. If you find that the risk of danger inherent in the challenged design outweighs the benefits of such design, then you may find that the product is defective. You may consider the following in that respect: (1) The gravity of the danger posed by the challenged design; (2) the likelihood that such danger would occur; (3) the mechanical feasibility of a safer alternative design; (4) the financial cost of an improved design; (5) the adverse consequences to the product and to the consumer that would result from an alternative design."

Volumes have been written about the language of Comment *i* to § 402A, the requirement that a product be both defective *and* unreasonably dangerous and the proper definition or instruction to be given as to the meaning of the term "unreasonably dangerous." Recently James E. Beasley, writing for the American Law Institute, has published a monumental work consisting of 846 pages devoted solely to a study of the term. Beasley, *Products Liability and the Unreasonably Dangerous Requirement* (1981). It is the plaintiff's contention that when a design defect, as opposed to a manufacturing defect, is the basis for the imposition of strict liability that an alternative test not contemplated by the Restatement or PIK should be given. There is substantial credible authority for her position. California, in *Greenman v. Yuba Power Products, Inc.,* 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963), was the initial jurisdiction to adopt the doctrine of strict

liability and did so prior to the adoption of § 402A by the Restatement and therefore, has never tied its decisions to the provisions of § 402A. In *Cronin v. J.B.E. Olson Corp.,* 8 Cal. 3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972), the court specifically rejected the "unreasonably dangerous" requirement of the Restatement and in 1978, in *Barker v. Lull Engineering Co.,* 20 Cal. 3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978), adopted a two-pronged test or standard which incorporates a consumer expectation test with what the court calls the "risk-benefit" test. The two-pronged test adopted in *Barker* is obviously the basis for the instruction requested by plaintiff. The *Barker* court stated:

"[I]n evaluating the adequacy of a product's design pursuant to this latter standard [the risk-benefit standard], a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. . . .

. . . .

"Thus, to reiterate, a product may be found defective in design, so as to subject a manufacturer to strict liability for resulting injuries, under either of two alternative tests. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.

. . . .

"We hold that a trial judge may properly instruct the jury that a product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove, in light of the relevant factors discussed above, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." pp. 431-435.

Plaintiff urges that we adopt the two-pronged *Barker* test and asserts error in this case based upon the failure of the trial court to do so. *Barker* obviously contemplates that in addition to the two-pronged test, the jury will also be instructed on the "relevant factors" that apply to the particular facts of the case under the risk-benefit theory. As previously indicated, there is considerable

respectable authority outside of California for the position taken by plaintiff. Likewise there is considerable respectable authority for limiting the instructions to a definition of "unreasonably dangerous" based upon the Restatement. Beasley includes in the jurisdictions that consider the "unreasonably dangerous" standard inapplicable and which apply the California test or a variation of it, the states of Alaska, Pennsylvania, New York, Ohio, Nebraska, Hawaii, Nevada, Colorado, Missouri, North Dakota and Delaware. The same author includes in the states which follow the Restatement and a Comment *i* standard, Oklahoma, Connecticut, New Hampshire, Illinois, Arizona, Utah, New Mexico, Vermont, Nevada, Iowa, Indiana, Idaho and South Carolina. Kansas is classified as being a Restatement jurisdiction which has not fully defined the term "unreasonably dangerous." Federal courts are also hopelessly split on the issue, usually following what they perceive to be the test in the particular state jurisdiction involved.

Another respected authority, Dean John W. Wade, has extensively criticized the use of the term "unreasonably dangerous" and the consumer expectation doctrine. He has advocated the consideration of seven factors similar to those set forth in *Barker* in determining the proper standard for application of strict liability. However, he apparently is of the opinion that the factors are usually to be considered only by the trial court in determining whether the case should be submitted to the jury or whether a directed verdict would be proper and by the appellate courts in considering the rulings of the trial judge. Dean Wade states:

"Should the jury be told about the list of seven factors which were set forth above? The answer should normally be no. The problem here is similar to that in negligence. The Restatement of Torts has analyzed negligence, described it as a balancing of the magnitude of the risk against the utility of the risk, and listed the factors which go into determining the weight of both of these elements. This analysis is most helpful and can be used with profit by trial and appellate judges, and by students and commentators. But it is not ordinarily given to the jury. Instead, they are told that negligence depends upon what a reasonable prudent man would do under the same or similar circumstances. Occasionally, when one of the factors has especial significance, it may be appropriate for the judge to make reference to it in suitable language. For example, in factor number 6, if the dangerous condition of the product is perfectly apparent, the judge might refer to this in telling the jury that they are to decide whether a reasonable prudent man would put the product on the market, or whether its danger was so great that it ought not to be marketed at all, despite the obviousness of the danger." Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 840-41 (1973).

Thus it becomes apparent that even among those authorities who advocate a balancing test using numerous risk-benefit factors, there is no unanimity as to how the factors or the standard are to be utilized in the actual trial of a case.

In *Prentice v. Acme Machine & Supply Co.,* 226 Kan. 406, 601 P.2d 1093 (1979), the plaintiff was proceeding under the theory of strict liability in a products liability case. The court gave PIK Civ. 2d 13.22 as one of its instructions and also gave some instructions which would ordinarily be given only if the plaintiff were also asserting a cause of action in negligence. This court held that the failure to give PIK Civ. 2d 13.21 and the intermingling of instructions on negligence resulted in clearly erroneous instructions and required a new trial. In the instant case plaintiff has conceded that the instructions given substantially comply with PIK Civ. 2d 13.21 and 13.22 and there is no issue about the negligence instructions which were given as plaintiff was proceeding upon the theory of negligence as well as strict liability.

In *Lindquist v. Ayerst Laboratories, Inc.,* 227 Kan. 308, 607 P.2d 1339 (1980), plaintiff brought a medical malpractice action involving certain doctors and the use of the anesthetic Fluothane manufactured by the defendant Ayerst. One of plaintiff's theories was based upon the product liability doctrine of strict liability insofar as Ayerst was concerned. Plaintiff asserted error in the failure of the trial court to give certain requested instructions reflecting different versions of the doctrine of strict liability in tort. This court stated:

"We have carefully examined the requested instructions and the instructions that were given and find *the jury was properly instructed regarding the doctrine of strict liability expressed in Restatement (Second) of Torts § 402A (1965)."* p. 319. (Emphasis added.)

We conclude that the trial court did not commit error in refusing to give the *Barker* type instruction requested by plaintiff and in giving the consumer expectation test instruction from Comment *i* of the Restatement which has consistently furnished the basis for our adoption and enforcement of strict liability in tort. For a compilation of numerous cases from various jurisdictions which have adopted a standard identical to or similar to the instructions in this case, see Beasley, *Products Liability and the Unreasonably Dangerous Requirement,* pp. 167-210.

We see nothing to be gained in extending this opinion further

although numerous authorities, pro and con, could be reviewed. For those interested in pursuing the matter further, the following will supply a fertile source of information: Beasley, *Products Liability and the Unreasonably Dangerous Requirement* (1981); Comment, *Nichols v. Union Underwear Co. and the Meaning of "Unreasonably Dangerous"; A Call for a More Precise Standard,* 69 Ky. L.J. 419 (1980-81); Traynor, *The Ways and Meanings of Defective Products and Strict Liability,* 32 Tenn. L. Rev. 363 (1965); Wade, *Strict Tort Liability of Manufacturers,* 19 Sw. L.J. 5 (1965); Keeton, *Product Liability and the Meaning of Defect,* 5 St. Mary's L.J. 30 (1973); Note, *Strict Liability in Tort: Is It Applicable to Design Defects?,* 20 Washburn L.J. 600 (1981); Keeton, *Products Liability - Design Hazards and the Meaning of Defect,* 10 Cumberland L. Rev. 293 (1979); Annot., 51 A.L.R.3d 8; Annot., 54 A.L.R.3d 352; ad infinitum.

Having determined that the instruction using the term "unreasonably dangerous" and defining it in the terms of the Restatement § 402A, Comment *i,* was proper, the judgment is affirmed.

PRAGER, J., dissenting. I respectfully dissent as to syllabus ¶ 6 and corresponding portions of the majority opinion. My dissent is directed solely to the issue whether the trial court erred in instructing the jury on the definition of "unreasonably dangerous" which appears in Comment *i* of § 402A of the Restatement of Torts, Second.

As pointed out in the majority opinion, the doctrine of strict liability in the area of products liability was judicially adopted in this state in *Brooks v. Dietz,* 218 Kan. 698, 545 P.2d 1104 (1976). In recognizing the doctrine, the court relied on the American Law Institute's revised Restatement of Torts, § 402A, which is quoted in full in the majority opinion. Since *Brooks,* there have been several other products liability cases decided by the court.

A careful reading of § 402A reveals that, as a condition precedent to strict liability becoming operative in a particular case, the product sold must be "unreasonably dangerous" to the user or consumer. This court has never specifically addressed the question of how that concept should be presented to the jury in a defective design case. We are now faced with that specific problem. The instruction objected to by the plaintiff in the district court was instruction No. 18 which stated as follows:

"No. 18

"A product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

This instruction was based on Comment $i$ of § 402A of the Restatement which is quoted in full in the majority opinion. The issue presented has thrust us into the most agitated and vexing controversy in the field of products liability today. The controversy is discussed by Justice Holmes in the majority opinion.

Products liability was first mentioned in a California case in 1944, *Escola v. Coca Cola Bottling Co.,* 24 Cal. 2d 453, 150 P.2d 436 (1944). It was first applied nineteen years later in *Greenman v. Yuba Power Products, Inc.,* 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963). In 1965, the American Law Institute (ALI) adopted the philosophy of *Greenman* in § 402A of the Restatement. Thereafter, jurisdiction after jurisdiction followed the ALI's lead in recognizing strict liability in tort for product defects. The plaintiff's burden under the theory was simply to show that a product was defective and in an unreasonably dangerous condition when it left the hands of the manufacturer.

The problem still remained, however, of determining how a plaintiff would show that the product was defective and in an unreasonably dangerous condition. At this point, the consumer expectation test articulated in Comment $i$ to § 402A seemed appropriate. Strict liability was to be imposed only where consumer expectation had been defeated. The consumer expectation test was approved by a number of commentators because it focused on what was then seen as the primary issue in strict liability: Was the product manufactured as it was designed? The test worked remarkably well in cases where the product causing injury was constructed in a manner not in accordance with the manufacturer's original design. If the machine was structurally weak or if some essential part was left out in construction, then the consumer expectation test took care of the problem. Obviously, a consumer expected a machine to be manufactured in accordance with the way it was designed to be built.

As the law developed, noted commentators in the products liability field began to criticize the consumer expectation standard in cases involving design defects. One commentator called it a nebulous test—a vague and a very imprecise one—because the ordinary consumer cannot be said to have expectations as to

safety regarding many features of the complexly made products that are purchased, such as the risk of fire from the way gasoline tanks are designed and installed in cars or the magnitude of the risks of cars overturning and the like. Dean John W. Wade, Reporter of the Second Restatement, noted that the consumer expectation test failed because, in many situations, the consumer would not know what to expect, because he would have no idea how safe the product could be made. Some commentators perceived the test as simply requiring that any dangerous product was legally acceptable as long as the ordinary consumer would not be surprised by it. Thus, in a relative short period of time, the consumer expectation test had come into disfavor. The criticism of the commentators naturally resulted in challenging the consumer expectation test in the courts. As noted in the majority opinion, the California Supreme Court was one of the first courts to reject the consumer expectation test. Other jurisdictions soon followed the California approach. The consumer expectation test now appears to have been repudiated in at least twenty-two jurisdictions, although it appears to be viable, at least to some extent, in thirteen jurisdictions. There are a number of jurisdictions where the issue has not yet been addressed.

In determining the basic issue presented in this case, we should first examine carefully the consumer expectation test to determine whether it should be judicially adopted as a part of the tort law of Kansas. This is a policy decision which the court must make. There are no Kansas cases which have directly addressed the issue and established that policy. It is, of course, elementary that any rule of law should be based on reason and justice and not on blind adherence to authority and precedent. Since this court is not bound at this time by precedent, we are free to examine the consumer expectation test and to consider it along with alternative tests which have been suggested. I cannot go along with the adoption of the consumer expectation test because, in my judgment, it will produce injustice, not only to injured consumers, but also to responsible manufacturers. I feel it my obligation to discuss what I believe to be serious defects of the consumer expectation test which make it undesirable for adoption as the test to be used in determining design defect cases under the strict liability doctrine.

Simply stated, the consumer expectation test declares that a

product is "unreasonably dangerous" if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it. My specific objections to this test are as follows:

(1) The consumer expectation test is not an *objective* test. In my judgment the ends of justice require an objective test, not a subjective test, in the area of products liability. A subjective test in this field of the law is not really a test at all. It is an unbridled license to the jury to "do good" in the particular case. It has been described as "haphazard subjectivity." Since it depends on the particular jury's concept of what may be in the consumer's mind, the test is bound to produce inconsistent jury verdicts in comparable cases. This is unfair both to injured plaintiffs and to defendant manufacturers.

(2) In determining whether or not a particular product is defective and unreasonably dangerous, the test to be applied by the jury should be focused on the product, not on the consumer's mind. In applying such a test, objective scientific standards can be utilized while in the consumer expectation test they cannot. As one commentator has suggested, the consumer expectation test creates a built-in tendency to short circuit the analytical process. In fact, it cannot be denied that the consumer expectation test fails to recognize the fact that a particular consumer may not have any knowledge or expertise whatsoever in the area of manufacturer design.

(3) In weighing the merits of a particular product design, basic justice would seem to require that all parties have the right to have the jury's attention directed to all relevant factors for their consideration in determining whether the particular product was dangerously defective. The purpose of jury instructions is to inform the jury in such a way that its verdict will be based on a logical analysis of the evidence in the light of established legal principles. In an automobile damage suit, for example, our trial courts in their instructions instruct the jury as to the right of way of the vehicles and a myriad of other duties created by statute which may be applicable in the particular case. Unless a jury is informed as to what factors should be considered in determining whether a product is unreasonably dangerous, there is really no guidance given to the jury at all.

The alternative test which has been adopted in recent years in

many jurisdictions is a test which focuses on the product rather than on the mind of the consumer. This test has been denominated the "risk-utility balancing" test by some commentators and the "excessive preventable danger" test by others. No matter what the test may be called, it is based on the legal duty of a manufacturer to provide a reasonably safe *product.* The substantive idea underlying the risk-utility balancing test, as a basis for a finding of defective design, is that a product is defective when designed in a particular way if the risk or danger inherent therein outweigh the benefits. The attractiveness of this charge is attributable to the fact that it directs the attention of attorneys, trial judges, and juries to the necessity of weighing the danger inherent in a particular design against its utility. It is based upon the rationale that the only way to ascertain whether or not a product design is good or bad is to inquire about the danger inherent in it and the justification for this danger.

In my judgment the test which should be submitted to a jury in the trial court's instructions to assist the jury in determining whether a product is defective and unreasonably dangerous should be in the following form:

A product is defectively designed in some aspect if the product as so designed is unreasonably dangerous. It is unreasonably dangerous as so designed, even though ordinary care is exercised in providing warnings and instructions, if a reasonable person would conclude that the magnitude of the danger of the design as it is proved to be at the trial outweighs the utility of the design.

In determining the magnitude of the danger, you should consider:

(1) the degree of the likelihood of harm from intended and reasonably foreseeable use;

(2) the seriousness of the harm that is likely to result when an injury does happen; and

(3) the obvious nature of the danger and the consequent avoidability of some harm by proper use.

In determining the utility of the design, you should consider:

(1) the importance of the need or needs served by the product and its design;

(2) the technical and economic feasibility and practicability of serving those needs with a safer design, and

(3) the availability of other products, if any, to serve the same needs.

In *Barker v. Lull Engineering Co.,* 20 Cal. 3d 413, 431, 143 Cal. Rptr. 225, 573 P.2d 443 (1978), the California Supreme Court stated that in evaluating the adequacy of a product's design a jury should consider as relevant factors (1) the gravity of the danger posed by the challenged design; (2) the likelihood that such danger would occur; (3) the mechanical feasibility of a safer alternative design; and (4) the adverse consequences to the product and to the consumer that would result from an alternative design.

In recent years the United States Department of Commerce has sought to achieve greater uniformity in products liability law by a proposed model Uniform Product Liability Act (UPLA). This act has been championed by many commentators, including Dean Wade, who suggested that it may be some time before the act is adopted, but that its provisions may, in the meantime, assist the state courts in establishing guidelines for products liability actions. Under UPLA, the five factors to be balanced by a jury in a design defect case are as follows:

(1) The likelihood at the time of manufacture that the product would cause the harm suffered by the claimant;

(2) the seriousness of harm;

(3) the technological feasibility of manufacturing a product designed so as to have prevented claimant's harm;

(4) the relative costs of producing, distributing, and selling such an alternative design; and

(5) the new or additional harms that may result from such an alternative design.

The trier of fact is required to evaluate these factors as of *the time of manufacture,* not at the time of trial.

Dean Wade has suggested that not every factor will be appropriate in every lawsuit but has recognized that, *where a factor is significant, a jury should be so informed.* Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 833-34 (1973), and more recently in Wade, *On Product "Design Defects" and Their Actionability,* 33 Vand. L. Rev. 551, 572-73 (1980).

In my judgment, the majority's adoption of the consumer expectation test will cause more confusion and uncertainty in the

law of products liability and make it much more difficult to apply. On the other hand, the adoption of a test directed toward the product rather than the mind of the consumer would result in fairness to all the parties concerned and better serve the needs of justice.

I am further convinced that the adoption of the risk-utility balancing approach in design defect cases would be consistent with Kansas products liability law as recognized in the past and also to the legal concepts contained in the new Kansas Product Liability Act (K.S.A. 1981 Supp. 60-3301 *et seq.*). As pointed out above, this court adopted strict liability in 1976 in *Brooks v. Dietz,* 218 Kan. 698. However, in 1971, this court had previously had occasion to consider and determine a case dealing specifically with design defects. That case was *Garst v. General Motors Corporation,* 207 Kan. 2, 484 P.2d 47 (1971). In *Garst,* it was contended that the design of the braking and steering systems on a TS-24 Euclid earthmover manufactured by General Motors Corporation was defective. The theory of plaintiff's case was based on negligence since the doctrine of strict liability had not yet been adopted. In a perceptive opinion which anticipated much of the development of design defect analysis, Justice Schroeder (now Chief Justice Schroeder), speaking for the court, stated:

"In a products liability case where a manufacturer is charged with negligence in the design of his product, the determination as to whether or not a manufacturer has in fact exercised due care in the design of his product requires the consideration of several matters. A significant factor is whether others in the field are using the same design, or a safer design. Other factors to be considered are whether a safer design not yet in use is known to be feasible, and whether in the case of a new product there has been adequate testing." Syl. ¶ 6.

This opinion is significant because it demonstrates the logic of considering a number of significant factors to be used in determining whether a particular design is defective. It is interesting to note that the *Garst* opinion has been widely quoted by scholars throughout the country in their attempts to work out the risk-utility balancing test. See Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication,* 73 Colum. L. Rev. 1531, 1557 (1973); Twerski, Weinstein, Donaher, and Piehler, *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age,* 61 Cornell L. Rev. 495, 529 (1976); Shapo, *A Representational Theory of*

*Consumer Protection: Doctrine, Function and Legal Liability for Product Disappointment,* 60 Va. L. Rev. 1109, 1207 (1974); Henderson, *Coping with the Time Dimension in Products Liability,* 69 Cal. L. Rev. 919, 923 (1981).

In *Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383 (1976), decided subsequent to *Brooks v. Dietz,* this court reaffirmed its position in *Garst* that the test in design defect cases is what a reasonably prudent manufacturer would have done. It is significant that *Jones* came after the adoption of strict liability in *Brooks* and that plaintiff brought his action under both negligence and strict liability. The language used in *Jones* is similar to the language contained in the Kansas Product Liability Act (K.S.A. 1981 Supp. 60-3301 *et seq.*).

The Kansas Product Liability Act in K.S.A. 1981 Supp. 60-3302(*c*) provides that it covers any "product liability claim," including claims brought for harm caused by defective design, and includes actions based on strict liability in tort or on negligence or "under any other substantive legal theory." Under K.S.A. 1981 Supp. 60-3304, the test to be applied in products liability cases is essentially the reasonably prudent product seller test, not a test based upon the consumer's expectations. The balancing test which I have urged the court to adopt is thus consistent with the rationale of *Garst* and also that established by the 1981 legislature in the Kansas Product Liability Act.

Before closing, I think it important to point out that there is no language in PIK Civ. 2d 13.21 (1977) or 13.22 which adopts or approves the consumer expectation test as the test to be applied in determining whether or not a product is in an unreasonably dangerous condition. In PIK Civ. 2d 13.21 the term "unreasonably dangerous condition" is defined as follows: "A condition is unreasonably dangerous if it is dangerous when used in the way it is ordinarily used considering the product's characteristics and common usage." The record in this case shows that counsel for the plaintiff urged the trial court to give the PIK definition as opposed to the definition based on Comment *i* of § 402A of the Restatement, which the court in fact gave. The definition contained in PIK Civ. 2d 13.21 is simply not based on the consumer expectation test which was given in instruction No. 18 by the trial court in this case.

For the reasons set forth above, I respectfully dissent. I would reverse and remand the case for a new trial.

MILLER and HERD, JJ., join in the foregoing dissent.