ERICK A. WALTERS, Plaintiff-Appellant, v. MAREN ENGINEERING CORPORATION, Defendant and Third-Party Plaintiff-Appellee (Winter Paper Stock Company, Inc., *et al.*, Defendants and Counterdefendants and Third-Party Plaintiffs; Air Conveying Corporation, Third-Party Defendant-Appellee).

First District (1st Division)   No. 1—90—0315

Opinion filed May 10, 1993.

Michael R. Panter & Associates and David A. Novoselsky & Associates, both of Chicago (Michael R. Panter and David A. Novoselsky, of counsel), for appellant.

Kralovec, Marquard, Doyle & Gibbons, Chartered, of Chicago (Nancy J. Arnold and John C. Doyle, of counsel), for appellee Maren Engineering Corporation.

John T. Burke & Associates, P.C., of Chicago (John T. Burke and David O. Lehman, of counsel), for appellee Air Conveying Corporation.

Hinshaw & Culbertson, of Chicago (Carlton D. Fisher, Nancy D. Lischer, and Gary J. Bazydlo, of counsel), for other defendants.

JUSTICE O'CONNOR delivered the opinion of the court:

On September 15, 1978, plaintiff Erick Walters sustained personal injuries when he reached into an access port of a cardboard paper shredding system while working for the Love Box Company (Love Box) in Wichita, Kansas. The system consisted of conveyor belts, which fed into a shredder, a transition hood, which led into an air duct system, and a baler, to which the air ducts ultimately carried the shredded cardboard. The access port in question was located on the transition hood.

On September 4, 1980, plaintiff filed a two-count complaint in the circuit court of Cook County which asserted a strict products liability claim against defendant Maren Engineering Corporation (Maren), the manufacturer of the shredder and baler, and a negligent modification claim against defendants Winter Paper Stock Company, Inc., Laboiteaux Recycling Company, Laboiteaux Company, Segal Schadel Company and Segal Schadel Company, Inc. (the LaBoiteaux defendants, collectively). This latter theory claimed that the LaBoiteaux defendants, to whom the system was originally sold, negligently changed the glass which covered the access port from a fixed window to a moveable one. After owning and using the system for two years, the LaBoiteaux defendants dismantled it and sold it to Love Box.

Maren and the Laboiteaux defendants subsequently impleaded Love Box and Air Conveying Corporation, the original designer of the transition hood. Maren and the LaBoiteaux defendants also filed contribution actions against each other and charged plaintiff with assuming the risk and contributory negligence.

Eighteen months prior to trial, Love Box successfully moved to dismiss itself from the case based on an exclusivity of remedy provision within Kansas' worker's compensation laws. This dismissal is not at issue on appeal. Maren subsequently moved prior to trial to confirm the application of Kansas substantive law to the remainder of the case. Maren received the confirmation it sought.

Following a jury trial, the jury returned on June 13, 1989, its verdict which found plaintiff 40% at fault and Love Box Company 60% for plaintiff's injuries. Maren and the LaBoiteaux defendants were found to be 0% at fault.

On appeal, plaintiff asserts that the circuit court erred in the following respects: (1) in applying the substantive law of Kansas rather than that of Illinois where Illinois has the most significant relationship to this action; (2) in allowing defendants to seek contribution from one another where Kansas, unlike Illinois, only recognizes indemnity actions; (3) in allowing defendants to introduce evidence of Love Box's negligence at trial where plaintiff was not previously notified that such evidence would be offered; (4) in directing plaintiff's expert during cross-examination to either invoke the fifth amendment's self-incrimination privilege or answer the question posed, where such court action suggested criminal activity on the part of the expert; (5) in precluding plaintiff from amending his complaint following trial to allege a negligence action against Maren where such amendment merely conformed the pleadings to the proof; (6) in instructing the jury with certain Kansas pattern jury instructions where they did not adequately set forth plaintiff's theory of his case and improperly allowed apportionment of fault contrary to Kansas law; and (7) the court erred in denying plaintiff's motion for new trial based on the jury's verdict being against the manifest weight of the evidence.

In 1973, Winter Paper Stock Company, Inc., an Ohio corporation, contacted Maren, an Illinois corporation, about purchasing a shredding system to shred and bale scrap paper and cardboard. Winter Paper and Segal Schadel Company, an Ohio corporation, had been purchased by LaBoiteaux Recycling Co., an Ohio corporation, in 1973 and were divisions of LaBoiteaux Recycling Co. The LaBoiteaux Company owns 100% of the stock of the LaBoiteaux Recycling Co.

Maren constructed the shredder and the baler. Air Conveying, an Illinois corporation, designed the transition hood and duct work. Memphis Blow Pipe, a Tennessee corporation, manufactured the transition hood based on those designs. The original design and manufacture of the transition hood utilized a fixed plexiglass window over the access port.

In 1974, the entire system was delivered and installed at Winter Paper. Winter Paper used the system for about one year after which the machine was shut down. In 1976, the system was dismantled and sold to Love Box in Wichita, Kansas. Love Box was in the business of making cardboard boxes and the shredder was used on waste cardboard.

On September 15, 1978, plaintiff was working for Love Box on the shredding machine when he attempted to clear a jam by sticking his hand into the access port, which by now was covered by a moveable sheet of Plexiglass. Testimony at trial conflicted as to when the change occurred.

Testimony also conflicted on whether plaintiff shut the machine off prior to inserting his hand, with plaintiff testifying he did, and a co-employee testifying that plaintiff admitted to him after the accident that he did not. The testimony shows, however, that soon after plaintiff stuck his hand into the machine, the shredder blades engaged, causing serious injuries to plaintiff. An "on/off" switch next to the access port was subsequently installed by Love Box.

The case quickly became a battle of the experts. Maren blamed plaintiff for his own injuries, blamed others for modifying the access port window and blamed Love Box for failing to properly train and supervise its employees. Maren's experts claimed that the system was properly designed: no interlocks were needed for a fixed window assembly. An interlocking device turns the system off in the event an access port window is opened. If a downstream user installed a moveable window, simple safety precautions could then be taken.

The LaBoiteaux defendants asserted during trial that they bought and sold the machine in the same condition—with a fixed access port window. Their experts, like Maren's, were also critical of plaintiff's conduct and Love Box's.

Air Conveying's expert testified that its fixed window design was not defective and that either the LaBoiteaux defendants or Love Box modified the access port window. No interlocking device was required for a fixed window assembly.

Plaintiff's experts testified that Maren's shredder was defective, *inter. alia*, because it failed to anticipate an access port window being

present on the transition hood. The experts asserted that Maren should have built electronics into its system which would shut the system down in the event an access port window on the transition hood was opened. Even though Maren did not construct the transition hood, it could anticipate the use of one. Instructions in the owner's manual should have instructed owners on how to install a protective mechanism such as an interlock device. The experts also opined that the system should have had better on-off indication lights which would be visible from the access port.

Plaintiff first alleges on appeal that the circuit court improperly applied the substantive law of Kansas where Illinois had the most significant relationship to the parties and the occurrence. We disagree.

■ In *Ingersoll v. Klein* (1970), 46 Ill. 2d 42, 45, 262 N.E.2d 593, our supreme court abandoned Illinois' prior choice of law rule applicable to tort actions—the doctrine of *lex loci delicti*—and instead adopted the "most significant relationship" test of the Restatement (Second), Conflicts of Laws. The court stated: "the local law of the State where the injury occurred should determine the rights and liabilities of the parties, unless Illinois has a more significant relationship with the occurrence and with the parties, in which case, the law of Illinois should apply." *Ingersoll v. Klein* (1970), 46 Ill. 2d 42, 45, 262 N.E.2d 593; accord *Ferguson v. Kasbohm* (1985), 131 Ill. App. 3d 424, 475 N.E.2d 984 (the law of the place of injury presumptively controls unless another State has a more significant relationship to the occurrence or parties).

The factors a court is to consider in determining which forum has the most significant relationship with the occurrence and the parties are: (1) the place where the injury occurred; (2) the place where the conduct occurred; (3) the domicile, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship of the parties is centered. (*Ingersoll*, 46 Ill. 2d at 47-48.) In determining the relative importance of the contacts, the forum is to consider the issues, the character of the tort and the relevant purposes of the tort rules of the interested States. *Ingersoll*, 46 Ill. 2d at 48.

In this case, the States have the following contacts:

*Kansas*: the place of injury, the place of plaintiff's contributory negligence and/or assumption of the risk; the place of Love Box's alleged negligence; the location of the machine in question at the time of the injury; the place of plaintiff's residency; and Love Box's **State** of incorporation.

*Tennessee*: the place where Memphis Blow Pipe manufactured the transition hood containing the access port into which plaintiff stuck his hand.

*Ohio*: the State of incorporation of Winter Paper, to whom the cardboard paper recycling assembly was originally sold and where Winter Paper allegedly modified the transition hood's access port; the State of incorporation of the Laboiteaux Recycling Company (originally known as Segal Schadel Company, an Ohio corporation), a holding company which owns stock in Winter Paper; the place of incorporation of the Laboiteaux Company, which owns 100% of the stock in the Laboiteaux Recycling Company.

*Illinois*: the place of incorporation of Maren; the place where Maren designed, manufactured and sold the shredder and baler; the place of incorporation of Air Conveying Corporation; the place where Air Conveying designed the transition hood in question; the place where the LaBoiteaux Company had an office at the time of injury (but from which it conducted no business related to this litigation).

■ We find that plaintiff has failed to overcome the presumption that the substantive law of Kansas, the place where the injury occurred, governs in the instant case. Admittedly, Illinois has an interest in this case in seeing its substantive law apply. Illinois is Maren's place of incorporation and the State where it designed, manufactured and sold the allegedly defective shredder system. Illinois is also Air Conveying's State of incorporation and where it designed the transition hood through which plaintiff inserted his hand. Illinois has an interest in seeing its substantive laws applied to resident corporations sued over conduct arising within Illinois.

However, the contacts which Kansas has with the parties and the occurrence are at least as significant as those of Illinois and, arguably, even more so. The alleged improper modifications occurred in either Ohio or Kansas; plaintiff was injured and resided in Kansas; and other questioned conduct of Love Box, a Kansas corporation and Kansas employer, occurred in Kansas.

Thus, on balance, while Illinois' contacts with the occurrence and the parties are not unimportant, we cannot say that Illinois has a more significant relationship than Kansas. The court correctly applied Kansas law.

■ Plaintiff has made the related argument that he was prejudiced by the court's late determination that Kansas' substantive law would apply. We find it difficult to understand how a party is prejudiced by the application of the correct substantive law. Moreover, choice of law issues frequently arise in actions such as this, which in-

volve multiple States. At least 18 months prior to trial, when Love Box was dismissed based on Kansas' worker's compensation laws, plaintiff had notice that Kansas substantive law may apply to the remaining issues. Prior to trial, the LaBoiteaux defendants moved for a clarification on this issue, and the circuit court determined that Kansas law would indeed apply. Effective counsel would have been prepared for such a result, and even contemplated it when selecting a forum removed from where the injury took place. If plaintiff desired an earlier guarantee that Illinois substantive law would apply, he could have moved to clarify as Maren did. For these reasons, plaintiff's claim of prejudice is unpersuasive.

Plaintiff next alleges on appeal that the circuit court erred in allowing defendants to file and maintain claims for contribution. Plaintiff asserts that, because Kansas only recognizes indemnity actions, and not contribution actions where comparative negligence is at issue, no substantive basis exists to support defendants' contribution actions. Plaintiff accordingly asserts that these contribution actions should have been stricken.

■ We reject plaintiff's argument. Plaintiff has not directed this court to a motion to strike the contribution claims of which he complains. If plaintiff believed the contribution claims to be improper, he should have taken the appropriate action. Having so failed, plaintiff's argument is unpersuasive.

Additionally, plaintiff has failed to demonstrate on appeal how he sustained prejudice from the mere *existence* of the contribution claims. Illinois law holds that error is not "reversible unless it is demonstrated *** [to be] substantially prejudicial and affected the outcome of the trial." (*E.g., Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 416, 476 N.E.2d 1232.) Plaintiff has failed to articulate on appeal how the existence of these claims prejudiced his case. Plaintiff's argument is thus rejected.

Plaintiff next asserts that the circuit court erred in allowing defendants to present evidence of Love Box's negligence at trial. Plaintiff's argument is a procedural one. He asserts that under Kansas law, he was entitled to prior notice that defendants would present evidence of Love Box's negligence at trial.

An analysis of this issue must begin with Kansas' comparative negligence statute, which provides in relevant part:

"(b) Where the comparative negligence of the parties in any such action is an issue, the jury shall return special verdicts, or in the absence of a jury, the court shall make special findings, determining the percentage of negligence attributable to each

of the parties, and determining the total amount of damages sustained by each of the claimants, and the entry of judgment shall be made by the court. No general verdict shall be returned by the jury.

(c) On motion of any party against whom a claim is asserted for negligence resulting in death, personal injury, property damage or economic loss, any other person whose causal negligence is claimed to have contributed to such death, personal injury, property damage or economic loss shall be joined as an additional party to the action.

(d) Where the comparative negligence of the parties in any action is an issue and recovery is allowed against more than one party, each such party shall be liable for that portion of the total dollar amount awarded as damages to any claimant in the proportion that the amount of such parties causal negligence bears to the amount of the causal negligence attributed to all parties against whom such recovery is allowed." Kan. Civ. Pro. Code Ann. §60—258a (Vernon Supp. 1992).

In *Brown v. Keill* (1978), 224 Kan. 195, 580 P.2d 867, the Kansas Supreme Court interpreted major portions of the Kansas comparative negligence statute. Three principal holdings emerged from that opinion.

First, "the concept of joint and several liability between joint tortfeasors previously existing in this state no longer applies in comparative negligence actions. The individual liability of each defendant for payment of damages will be based on proportionate fault, and contribution among joint judgment debtors is no longer required in such cases." *Brown*, 224 Kan. at 204, 580 P.2d at 874.

Second, "a defendant in a comparative negligence case [may] bring in other joint tort-feasors so their percentage of fault can be determined and their liability, if any, adjudged." Further, even where this joined party has a valid defense, such as interspousal immunity or a covenant not to sue, "such a party's fault should be considered in each case to determine the other defendant's percentage of fault and liability, if any." *Brown*, 224 Kan. at 206, 580 P.2d at 875-76.

Third, "the intent and purpose of the legislature in adopting K.S.A. 60—258a was to impose individual liability for damages based on the proportionate fault of all parties to the occurrence which gave rise to the injuries and damages even though one or more parties cannot be joined formally as a litigant or be held legally responsible for his or her proportionate fault." Thus, "the percentage of fault of one who is not or cannot be formally joined as a party under subsection

(c) [is to] be considered under subsection (d) to arrive at the proportionate liability of the defendant or defendants[.]" *Brown*, 224 Kan. at 206-07, 580 P.2d at 876.

No party to this appeal readily disputes the principal holdings of *Brown*. The present issue on appeal, however, requires this court to go further than these holdings. The issue on appeal is whether any procedural conditions precedent exist prior to a defendant asserting at trial the negligence of a "phantom" defendant. To answer this issue, although not squarely addressed in *Brown*, the opinion provides persuasive guidance.

*Brown* was an automobile collision case in which Brown sued Keill for property damage to his Jaguar. Keill answered Brown's complaint alleging that the driver of the Jaguar at the time of the accident, Brown's son, was 90% at fault for causing the accident. Keill did not join the son in the action. Evidence of the son's negligence was introduced at trial, and the jury found that the son was indeed 90% at fault. Keill appealed from a judgment requiring her to pay Brown 10% of the damages awarded. The final two paragraphs of the *Brown* opinion are informative as to the current issue on appeal:

> "One final question must be answered in this case. Was the answer filed by the defendant and the evidence introduced thereon sufficient to obtain the determination of the percentage of fault attributable to the nonparty [the son]?
>
> The defendant Keill in her answer alleged that the son who drove the Jaguar was a party whose negligence or fault contributed to cause the collision and damage to plaintiff's vehicle. She alleged specific acts of negligence on the part of the son. There was sufficient testimony introduced at the trial to support these allegations and from which a percentage of fault could be determined. The son appeared at the trial and testified on behalf of the plaintiff. The plaintiff and defendant both understood the nature of the issue and introduced evidence on that issue. The trial court made findings as to the percentage of fault of each party involved in the collision, including that of the son. These findings adequately support the judgment entered thereon. We hold that the issue of the percentage of fault of the son was adequately raised in the pleadings, supported by substantial competent evidence and properly decided by the trier of fact." *Brown*, 224 Kan. at 207, 580 P.2d at 876.

In this case, Love Box was identified in prior pleadings. Both Maren and the LaBoiteaux defendants impleaded Love Box and alleged acts of negligence on its part which contributed to plaintiff's in-

jury. Although Love Box was later dismissed, the claims put plaintiff on notice that Love Box's fault was potentially an issue.

Further, prior to trial, Beldon Rich, a LaBoiteaux defense expert, testified for five pages in his discovery deposition regarding Love Box's negligence. Beldon Rich testified at trial about Love Box's negligence, and other evidence was introduced on this issue as well.

In the pretrial conference, Love Box was identified as a phantom defendant. Defendants pointed out that experts had given deposition testimony critical of Love Box. In fact, defendants referred to plaintiff's own expert as possessing opinions regarding Love Box's conduct. Counsel for Air Conveying also indicated that this type of evidence would be important during the instruction stage of the proceedings.

■ The facts of this case are similar to those presented in *Brown*. Love Box's conduct was identified in pleadings, the subject of expert opinions during discovery, discussed during the pretrial conference and testified to during trial. Plaintiff's allegation that he was without notice that defendants would· raise Love Box's conduct at trial is not supported by the record. Moreover, plaintiff has directed this court to no Kansas case holding or court rule *requiring* a formal document to be filed declaring an intention to introduce phantom defendant evidence. Although section 60—258a(d) speaks in terms of requiring a formal motion, *Brown* did not require one, nor have subsequent cases (see *Glenn v. Fleming* (1987), 240 Kan. 724, 732 P.2d 750; *Lester v. Magic Chef, Inc.* (1982), 230 Kan. 643, 641 P.2d 353).

Finally, if plaintiff desired an earlier ruling which would have prohibited the introduction of "phantom" evidence, plaintiff could have easily filed a motion *in limine* to prevent the introduction of such evidence. Having not taken action to protect himself, plaintiff's present complaint of surprise is not persuasive.

Plaintiff next alleges that the circuit court erred when it interjected into trial the privilege against self-incrimination during the cross-examination of plaintiff's expert, Marvin Salzenstein. Plaintiff alleges that he suffered "irreparable" prejudice because the jury could infer criminal behavior, which negatively affected the credibility of an important witness.

Maren and the LaBoiteaux defendants respond that plaintiff misrepresents what occurred during trial. Rather than the court unilaterally injecting the issue at trial, the record reveals that it was interjected in an attempt by the court to ferret out the witness' own objection to answering a properly posed question. Defendants allege

that the court's conduct fell within a trial court's broad discretionary power to control courtroom proceedings. We agree.

The alleged error occurred during the following questioning by Maren's counsel:

"Q. My question is to you, sir, and would you please tell us what would represent 50 percent of your annual salary over the last two years?

\* \* \*

THE COURT: Ordering the witness to answer the question.

THE WITNESS: I feel my salary is a very private thing, and I'm sorry, I can't give that to you because the question as asked doesn't really resolve [*sic*] around expert witnessing.

THE COURT: Just a moment.

MR. DOYLE: I move to strike the witness' comment.

THE COURT: The witness' comments are stricken. If you wish to refuse to answer the question on the grounds it might incriminate you, you may do that. That's the Fifth Amendment, and you have that privilege not to answer a question if you consider it to be something that you shouldn't answer. You have the Constitutional privilege of not answering a question. If you wish to do that the Court won't take further action on it and we will go on?

Do you take the Fifth Amendment?

THE WITNESS: Your Honor, I feel that's such a private thing that yes, I would refuse to answer the question.

THE COURT: You refuse to answer the question on the grounds it might incriminate you?

THE WITNESS: *Not that it is going to incriminate me.*

THE COURT: That's the only basis you can take the Fifth. Otherwise the Court is ordering you to answer the question.

THE WITNESS: What my salary is?

THE COURT: That's correct, whatever it is.

\* \* \*

THE COURT: Let the record show that the witness refused to answer the question." (Emphasis added.)

■■ As urged by Maren and the LaBoiteaux defendants, no error has occurred here. Contrary to plaintiff's argument, the witness conveyed the reason why he refused to answer the question. The witness stated it was not because of criminal wrongdoing, but because the witness believed the answer to be personal in nature. Given the witness' open-court statement regarding his motivation for refusing to

answer the question, plaintiff cannot claim that the jury drew a negative inference where the witness negated that inference himself.

Plaintiff next asserts that the court erred in denying his attempt to amend his complaint against Maren to add a negligence count. Maren responds that the court properly exercised its discretion in denying the amendment.

The record reflects that plaintiff moved to amend his complaint following the close of evidence and the presentation of directed verdict motions. Maren objected to the motion, contending that if the motion were granted, it would have no opportunity to establish its own due care. The court agreed with Maren, noting that if an amendment were allowed, a mistrial would have to be declared to allow Maren to fully develop its due-care defense. In the interests of judicial economy, the court believed it better to just deny plaintiff's desired amendment.

■■ Plaintiff has failed to show an abuse of discretion on appeal. Plaintiff's injury occurred in 1978, with plaintiff filing suit in 1980. Plaintiff's suit against Maren alleged strict liability, and Maren planned its defense based on this theory. Trial commenced in mid-1989 on this theory as well. Had plaintiff earlier amended his complaint, Maren would have had the opportunity to demonstrate at trial that it acted with due care in designing the shredding machine. Plaintiff's late attempt to amend denied Maren that opportunity. If the amendment were allowed, the jury would have deliberated on a theory which Maren did not have the full opportunity to defend. Thus, Maren would have suffered actual prejudice had the amendment been allowed. For these reasons, the amendment was properly rejected.

Plaintiff next asserts that the circuit court erred in instructing the jury with certain Kansas pattern jury instructions. Plaintiff directs this court to numerous instructions which he claims to be erroneous.

■■ We agree with Maren and the LaBoiteaux defendants that plaintiff has waived review of his alleged instructional errors. At no point did plaintiff proffer alternative instructions. Plaintiff has therefore waived any claim of error. *Harrington v. Rush-Presbyterian-St. Luke's Hospital* (1991), 210 Ill. App. 3d 183, 569 N.E.2d 15, *appeal denied* (1991), 141 Ill. 2d 540, 580 N.E.2d 114.

Defendant's final argument is that the jury's verdict was against the manifest weight of the evidence. We disagree.

A jury's verdict on contested factual issues will not be disturbed on review unless it is against the manifest weight of the evidence. (*Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 444,

511 N.E.2d 798, *appeal denied* (1987), 117 Ill. 2d 554, 517 N.E.2d 1096.) Where there is evidence in favor of the defendant which, if believed, supports the verdict in favor of defendant, the reviewing court should not set aside a jury determination. (*Tedrowe*, 158 Ill. App. 3d at 444.) "[T]he test is not whether the evidence *could have* supported a verdict for the movant if contrary inferences were drawn but whether a contrary verdict is clearly evident." (Emphasis in original.) *Tedrowe*, 158 Ill. App. 3d at 444.

■ Plaintiff has failed to meet his burden on review. The jury's verdict reflects its belief that plaintiff caused his own injury by inserting his hand through the window located on the transition hood without taking reasonable assurances that the machine in fact was off. Regarding Love Box's fault, the jury's verdict reflects one of two propositions. First, that Love Box altered the access window from a fixed to a moveable one without reasonably assuring that employees such as plaintiff did not inadvertently insert their hands while the shredder was operational. Second, even if Love Box did not alter the access window, it failed to take reasonable precautions to assure the safety of its employees. Ample evidence exists to support the findings of the jury. Accordingly, plaintiff's manifest weight of the evidence argument is unpersuasive.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

MANNING, P.J., and CAMPBELL, J., concur.