No. 55,827

ULYSSES BETTS, *et al.*, *Appellants/Cross-Appellees*, v. GENERAL
MOTORS CORPORATION, *Appellee/Cross-Appellant.*

(689 P.2d 795)

Opinion filed
October 26, 1984.

*Stephan B. Rhudy*, of Stephen B. Rhudy, Chartered, of Lawrence, argued the cause, and *Kari Suzanne Schmidt*, of Wichita, was with him on the briefs for the appellants/cross-appellees.

*Arthur P. Greenfield*, of Winston & Strawn, of Phoenix, Arizona, and *John J. Jurcyk, Jr.*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, argued the cause, and *W. Charles Thomson, III*, and *Ellen J. Waxman*, of Winston & Strawn, of Phoenix, Arizona, were with them on the brief for the appellee/cross-appellant.

The opinion of the court was delivered by

PRAGER, J.: This is a consolidated action to recover damages for wrongful deaths and personal injuries arising out of an automobile collision which occurred on the Kansas Turnpike on November 5, 1978, in Leavenworth County. The factual circumstances surrounding the accident were essentially undisputed and involved a high-speed, head-on collision between a 1974 Ford pickup truck driven by Richard C. Jones and a 1973 Chevrolet Monte Carlo which was towing a 1972 Chevrolet Vega by use of a rented U-Haul trailer hitch and towbar.

Simply stated, the collision was caused by the negligence of the driver of the Ford pickup, Jones, who was proceeding east on the turnpike and lost control of his vehicle when he apparently fell asleep. The Ford pickup proceeded out of the east lanes of traffic, across the center median strip, and into the westbound lanes of traffic where it collided head-on with the 1973 Monte

Carlo driven by Rogell C. Betts. Five members of the Betts family were passengers in the Monte Carlo. Witnesses to the accident estimated the speed of the Ford pickup to be greater than 60 miles per hour and the speed of the Monte Carlo to be greater than 40 miles per hour. Thus, the combined speed of the two vehicles was approximately 100 miles per hour. The head-on collision between the Ford and the Monte Carlo was immediately followed by a second collision between the rear of the Monte Carlo and the towed Vega when the U-Haul towbar mechanism came apart during the initial impact. According to the evidence, the separation of the trailer hitch and towbar raised the rear of the Monte Carlo, permitting the towed Vega to drive forward and underride the Monte Carlo by some four feet. The towbar, still attached to the front of the Vega, was driven into the fuel tank of the Monte Carlo causing a puncture. As a result, gasoline escaped from the fuel tank and a fire occurred. It also appears that gasoline escaped from the fuel tank of the Ford truck, which contributed to the fire.

Following the collision, several people attempted to put the fire out and to open the doors of the Monte Carlo to rescue the people inside. A state trooper was able to remove Ulysses Betts, a five-year-old child, from the burning car. He was the only survivor. The other five occupants of the Monte Carlo and Jones, the driver of the Ford pickup, were killed in the accident. This litigation followed.

The plaintiffs are the heirs-at-law of the five occupants of the Monte Carlo who were killed in the accident and Ulysses Betts, who suffered personal injuries. The plaintiffs alleged negligence and product liability against various defendants for their respective roles in causing the accident or in designing and manufacturing products involved. Named as defendants were the following: The estate of Richard C. Jones, driver of the Ford vehicle; U-Haul International, Inc., the rental company which furnished the trailer hitch and towbar; General Motors Corporation; Ford Motor Company; and the Kansas Turnpike Authority. All defendants in the litigation except General Motors Corporation settled with the plaintiffs prior to trial.

The plaintiffs based their claim of liability against General Motors on defective design and manufacture of the Monte Carlo, referring specifically to the location of the fuel tank of the

vehicle. Plaintiffs' theories of liability included negligence, strict liability in tort, and breach of implied warranty. Simply stated, the plaintiffs maintained that General Motors was liable as a manufacturer for the design and installation of a fuel tank at a location where it was likely to rupture in a collision and cause a gasoline fire. As designed and installed, the fuel tank was located at a point under the trunk of the Monte Carlo. Plaintiffs contended that this was unsafe and that a properly designed fuel tank would have been located over the rear axle of the vehicle, where it would have been better protected and not as susceptible of being crushed or penetrated in the event of a collision.

General Motors took the position that the under-the-trunk fuel tank location was a well conceived, well executed, and reasonably safe design. General Motors conceded that an over-the-axle location for a fuel tank was feasible as an alternative design. It did not contend that the over-the-axle design was *per se* unreasonably dangerous.

Prior to trial, the court on motion of General Motors bifurcated the issues of liability and damages so that in Phase I of the trial, the fault, if any, of General Motors, U-Haul, Richard C. Jones, and the Kansas Turnpike Authority would be considered and determined by the jury. Also, the liability of General Motors for punitive damages was to be determined during Phase I of the trial. Trial by jury commenced on April 6, 1983, and was concluded on May 4, 1983, when the jury returned an 11-1 verdict in favor of General Motors. The jury by its special verdict found that the location of the fuel tank on the 1973 Chevrolet Monte Carlo did not render the vehicle defective or unreasonably dangerous and that General Motors exercised reasonable care in the design and location of the fuel storage system. The trial court entered judgment on the verdict in favor of General Motors. The plaintiffs appealed.

At the outset, it should be noted that the case was well tried by competent trial counsel over a period of four weeks. Both plaintiffs and General Motors called to the witness stand well qualified experts in the automotive engineering field. As would be expected, the experts disagreed in their ultimate opinions in the case. Ninety separate exhibits were admitted at the trial to demonstrate to the jury the various approaches taken in the design and location of automobile fuel tanks. Plaintiffs' experts

testified as to the alternative designs available within the existing automotive technology. Evidence was presented in the form of publications, government-sponsored research and development programs, automotive industry research and development work, production vehicles from foreign and domestic manufacturers, and research and development work conducted by private industry and educational institutions. Evidence was presented analyzing crash tests performed on vehicles equipped both with under-the-trunk fuel tanks and over-the-axle fuel tanks. The nature and characteristics of the 1973 Chevrolet Monte Carlo, and its design and classification in the automobile industry were thoroughly explored. There was testimony as to the forces exerted on a fuel tank when crashes of various kinds occur. There was evidence as to design techniques used to protect fuel tanks from rupture and penetration by foreign objects. Plaintiffs' experts testified that the 1973 Chevrolet Monte Carlo under-the-trunk fuel tank was negligently designed, defective, and unreasonably dangerous because it was located in a prime crash site where it was subject to puncture, rupture, crushing, and bursting in foreseeable collisions. Each of them testified that a reasonably safe alternative design was a fuel tank location over the rear axle which was utilized in other General Motors vehicles. If the jury had accepted that testimony, it could have brought in a verdict in favor of the plaintiffs supported by substantial, competent evidence.

General Motors likewise paraded before the jury its engineering experts. They agreed that an over-the-axle location for the fuel tank was an alternative design then in use on various automobiles. These witnesses were of the opinion that a comparison between the over-the-axle location and the under-the-trunk location could properly be made only by considering such factors as the size, weight, and function of the particular automobile. They testified that the under-the-trunk design was a safer design for the 1973 Chevrolet Monte Carlo involved in the collision. Defendant's experts explained at the trial that the Monte Carlo, as the 1973 "A" car, was a new vehicle and consequently the design engineers were free to change the fuel tank storage system, including the location of the fuel tank. The evidence presented by General Motors showed that its designers initially preferred the over-the-axle fuel tank location for both

safety reasons and for compliance with new and more stringent evaporative emissions requirements. However, after further engineering consideration, the design engineers concluded that because of the proximity of the fuel tank to the trunk, the over-the-axle design was particularly vulnerable to puncture from ordinary trunk contents, such as jacks, tools, and the like. It was their opinion that the under-the-trunk fuel tank location better utilized the crush characteristics of the rear structure of the vehicle to protect the integrity of the fuel tank during an impact. These experts also indicated a number of other factors which caused them to arrive at their conclusion that the under-the-trunk location better satisfied goals of safety and integrity for fuel tank performance than the alternative over-the-axle location proposed by plaintiffs' experts.

There was extensive evidence that General Motors had used the over-the-axle location for the fuel tank on other General Motors automobiles of a different size and design. There was evidence that General Motors had conducted front-to-rear and front-to-front test crashes on "A" cars in order to generate data to compare the performance of the two designs. These tests were conducted on "A" cars with both over-the-axle and under-the-trunk fuel tanks. The testimony was conflicting with respect to the comparative costs of these two fuel storage system designs. The jury heard evidence that the over-the-axle design both was and was not a more expensive design than the under-the-trunk design. Suffice it to say, there was substantial, competent evidence presented at the trial which supported the verdict of the jury that General Motors was not at fault.

With this summary of the testimony in mind, we now turn to the issues raised by plaintiffs on the appeal. Plaintiffs first contend that the trial court erred in refusing to admit relevant evidence as to General Motors' knowledge of a safer design, its motives for not changing the design, and evidence of subsequent design changes. Plaintiffs argue that the trial court committed reversible error by excluding 316 different exhibits, of which only four exhibits were actually offered at the trial by the plaintiffs. Prior to trial, General Motors filed several motions in limine to exclude certain exhibits and other evidence from admission at the trial. As we analyze the record, these various motions were determined in an order of the trial court dated April 6, 1983, prior

to the beginning of the trial. In that order, the trial court stated specifically that an order on a motion in limine is not the final ruling on the admissibility of evidence but is binding on the parties and counsel until further order of the court. The court then proceeded to consider various exhibits which had been identified by the plaintiffs and different rulings were made on their admissibility. Certain exhibits pertaining only to damages were excluded from Phase I of the trial because the only issue to be determined was the liability of General Motors. Objections to certain exhibits were overruled by the trial court on the presumption that proper foundation would be presented by plaintiffs at the trial. The court reserved judgment on one exhibit which had never been filed with the court and was, therefore, unavailable for review by the court. One exhibit, a copy of a speech presented by an expert to the Society of Automotive Engineers, was excluded as hearsay, since the person who made the speech was not available as a witness. The court sustained General Motors' objection until such time as the plaintiffs could establish that the document was admissible under one of the exceptions to the hearsay rule and that it was essential or directly related to one of the issues in the case. The court declined to rule as a matter of law that certain proffered evidence relating to the safety and design of other vehicles was inadmissible in the case. Defendant's motion in that regard was denied. As to many of the exhibits which defense counsel sought to exclude, the motion to exclude was sustained subject to the right of plaintiffs at the trial to establish their admissibility. The court reserved decision on a number of exhibits until such time as there was an opportunity for the court to inspect them.

We have no difficulty at all in concluding that the trial court did not make any final order excluding plaintiffs' exhibits. It simply required counsel for the plaintiffs to lay an appropriate foundation at the trial to establish their relevancy and competency. If plaintiffs' counsel wanted these excluded exhibits to go into evidence, they were given the opportunity to present them for consideration by the trial court. As to those exhibits not offered at the trial, we cannot say that the trial court erred in its rulings.

It is important to note that General Motors, through its experts, never did deny the feasibility of the over-the-axle location of a

fuel tank in the 1973 Chevrolet Monte Carlo. Clearly, that location was utilized in other vehicles of a different design and weight. The fact that the over-the-axle location was utilized in vehicles manufactured by General Motors and other companies was never disputed. The basic issue in the case was whether the location of the fuel tank under the trunk rendered the 1973 Monte Carlo defective as being unreasonably dangerous. We hold that the trial court did not err in excluding certain exhibits pertaining to alternative designs. In fact, evidence of alternative designs in other vehicles was admitted at the trial. The General Motors experts frankly admitted that they had knowledge of alternative designs, and both parties introduced evidence of General Motors' own tests involving the performance of vehicles with both types of designs.

We have also concluded that the trial court did not commit error in excluding certain evidence as to Federal Motor Vehicle Safety Standard 301. In fact, the trial court permitted testimony regarding the existence of proposed standards as evidence of the considerations underlying General Motors' design and development of the 1973 Chevrolet Monte Carlo. The trial court emphasized in its ruling that Safety Standard 301 was a *proposed* standard and not an adopted standard for rear impact testing of vehicles. The plaintiffs themselves did not deny that the 1973 Chevrolet Monte Carlo was in compliance with all applicable federal standards then in effect. Also it should be noted that exhibits pertaining to the proposed standards were excluded for a number of reasons including hearsay objections.

Evidence in regard to General Motors' Experimental Safety Vehicle was excluded by the trial court on the basis that that vehicle was a factually dissimilar vehicle to the 1973 "A" car and, therefore, the evidence was not relevant to the issue of the safety of the 1973 Monte Carlo. We find no error here. We likewise conclude that the trial court did not commit error in excluding certain evidence of the location of fuel tanks on later models of General Motors vehicles on the grounds that it was cumulative and potentially prejudicial. There was a great amount of evidence admitted at the trial pertaining to cars both similar to and different from the 1973 Chevrolet Monte Carlo. This court on a number of occasions has held that a trial court has a right to reject relevant testimony where the evidence is cumu-

lative of facts established or where the probative value of the relevant evidence is outweighed by the risk of placing undue emphasis on some phase of the lawsuit with possible prejudice resulting. *Talley v. J & L Oil Co.*, 224 Kan. 214, 220, 579 P.2d 706 (1978); *State v. Davis*, 213 Kan. 54, 57, 515 P.2d 802 (1973); K.S.A. 60-445. In *Van Hoozer v. Farmers Insurance Exchange*, 219 Kan. 595, Syl. ¶ 11, 549 P.2d 1354 (1976), it is stated:

"A trial judge has the discretion to exclude relevant evidence if he finds its probative value is substantially outweighed by its prejudicial nature."

Considering the entire record, the posture of the case, the issues, and the relevant evidence which had already been admitted, we hold that the trial court did not abuse its discretion or commit reversible error in the evidentiary rulings complained of by the plaintiffs.

The plaintiffs' second point on the appeal is that the trial court erred in failing to instruct the jury on the so-called risk/utility balancing test rather than the consumer expectation test. The consumer expectation test was adopted by this court in *Lester v. Magic Chef, Inc.*, 230 Kan. 643, 641 P.2d 353 (1982). There the risk/utility balancing test was rejected. This decision was reaffirmed in *Barnes v. Vega Industries, Inc.*, 234 Kan. 1012, 676 P.2d 761 (1984). The court has considered the contention of the plaintiffs in this case that the risk/utility test should be adopted. A majority of the court adhere to the consumer expectation test approved in *Lester* and *Barnes*. We hold there was no error in this regard.

The contention of the plaintiffs that the trial court excluded certain relevant evidence because it applied the consumer expectation test is wholly without merit. The instruction given to the jury setting forth the test to be applied in determining whether a product is unreasonably dangerous really has nothing to do with the scope of evidence offered at the trial. In a products liability case involving a claimed design defect, the parties at the trial may present evidence as to the degree of the likelihood of harm from an intended and reasonably foreseeable use of the product and the feasibility of a safer design. Likewise, evidence may be introduced as to the importance of the need or needs served by the product and its design, the technical and economic feasibility and practicability of serving those needs with a safer design, and the availability of other products, if any, to serve the

same needs. *Garst v. General Motors Corporation*, 207 Kan. 2, 484 P.2d 47 (1971). We find no error in the court's instructing the jury on the consumer expectation test as the basis to determine whether a product is unreasonably dangerous.

The third point raised by plaintiffs on the appeal is that the trial court abused its discretion in ordering a bifurcated trial on the issues of liability and damages. In its order, the trial court indicated that one jury would be empaneled to resolve all issues presented in the case. However, the trial would be in two stages. In Phase I, the jury would determine if General Motors or other defendants were liable to the plaintiffs on a theory of negligence or strict liability. If the jury found General Motors at fault, the jury would then in Phase II of the trial determine the percentage of fault and determine the damages. The court stated its reasons for bifurcating the order. The court pointed out the advantages of a bifurcated trial in terms of jury comprehension of the issues, economy of court time, and reducing the trial expenses to the parties. It noted that the additional expenses of time and re-sources might be unnecessary if determination of the fault issues made the damages issues moot or enhanced the prospects of settlement. One of the stated reasons for the order of bifurcation was that there were six separate plaintiffs, each maintaining multiple causes of action, requiring at least twelve separate determinations of fault, eleven determinations of actual dam-ages, and six punitive damage decisions. These determinations by the jury would be simplified for the jury in a bifurcated trial. General Motors stipulated, and the jury was instructed, that at least one of the plaintiffs' decedents survived the impacts with-out suffering life threatening injuries, was conscious, and, thereafter, died as a result of the thermal burn injuries. In Phase I of the trial, the plaintiffs were authorized to introduce evidence establishing that there was a design defect in the 1973 Monte Carlo which caused unreasonable danger to the ordinary user and which was foreseeable to the manufacturer. The plaintiffs were also authorized to introduce evidence on the issue of wantonness.

We find no error in the order of the trial court bifurcating the trial. Such an order is authorized by K.S.A. 60-242(b) which provides, in substance, that in furtherance of convenience, to avoid prejudice, or when separate trials will be conducive to

expedition and economy, the judge may order a separate trial of any claim or any separate issues "always preserving inviolate the right of trial by jury." The same issue presented here was before the court in *Tilley v. International Harvester Co.*, 208 Kan. 75, 81, 490 P.2d 392 (1971). In *Tilley,* the court stated that the legislative intent behind K.S.A. 60-242(b) leaves to the discretion of the trial court whether or not certain issues should be separated for trial. We have no hesitancy in holding that the trial court did not abuse its discretion in its order bifurcating the trial in this case.

The plaintiffs' final point is that the cumulative effect of the trial court's evidentiary rulings, together with the failure of the court to give the requested risk/utility instruction, and the court's bifurcation order, denied the plaintiffs their right to a fair trial. This point involves essentially the same arguments presented in the points discussed above. We find it to be without merit.

We now turn to the cross-appeal filed by General Motors from the order of the district court denying its motion for extraordinary costs to be taxed against the plaintiffs pursuant to K.S.A. 60-2002. The trial court, in its ultimate decision, awarded the statutory items usually allowable as costs under K.S.A. 60-2003. General Motors sought additional costs from the plaintiffs in the amount of $86,416.14, covering the cost of depositions and transcripts, travel expense of witnesses incurred in taking depositions, storage expense of the accident vehicles, expenses incurred in photographing and producing meeting minutes, expenses incurred in preparation of trial exhibits, including photographs and rental of video equipment, crash statistic charts, purchase of exemplary vehicles for display at the trial, engineering services for conducting crash tests, and other unpaid costs of discovery. In denying these unusual costs, the trial court noted that costs are not routinely assessed against the losing party other than statutory costs.

The court was concerned that routinely assessing such extraordinary costs to a losing plaintiff would cause a "chilling effect" which would serve to limit the traditional right of free access to courts. The court cited a number of decisions to the effect that there is no right to recover costs except as authorized by statute. The court noted that the assessment of costs is discretionary with the trial court, and that the taxing of costs by a trial court will be

reviewed only as an abuse of discretion. The trial court stated it believed that in order to grant the defendant's motion in this case, the plaintiffs' cause of action or conduct in prosecuting same must be found to be wrongful in some respect, as being frivolous, without probable cause, or brought for purposes of harassment. The court could not find that any of these elements existed in the plaintiffs' cause of action or conduct and, therefore, denied the motion.

We find no error in the trial court's order. This court in *Negley v. Massey Ferguson, Inc.,* 229 Kan. 465, Syl. ¶ 4, 625 P.2d 472 (1981), stated that the taxing of costs by the trial court will be reviewed only to determine an abuse of discretion. It has been held that costs for preparation for trial are not ordinarily recoverable as costs. Also, discovery depositions by their very nature fall within the realm of trial preparation and are ordinarily not recoverable as costs unless used as evidence. *Wood v. Gautier,* 201 Kan. 74, 79, 439 P.2d 73 (1968).

The 1982 legislature adopted K.S.A. 60-2007, which provides for the assessment of additional costs including attorney fees and expenses incurred by the prevailing party, if the court finds that a party, in a pleading, motion or response thereto, has asserted a claim or defense and has denied the truth of a factual statement in a pleading or during discovery, without a reasonable basis in fact and not in good faith. Likewise, under that statute, an attorney may be held individually or jointly and severally liable with a party for such additional costs, where the court finds that the attorney knowingly and not in good faith asserted such a claim, defense or denial or, having gained knowledge of its falsity, failed to inform the court promptly that such claim, defense or denial was without reasonable basis in fact. Subsection (d) states that the purpose of this section is not to prevent a party from litigating bona fide claims or defenses, but to protect litigants from harassment and expense in clear cases of abuse. We agree with the trial court that the record in this case does not show that the action brought by the plaintiffs did not have a reasonable basis in fact and was not brought in good faith. There was substantial, competent evidence presented by both sides which would have supported the verdict of a jury for either the plaintiffs or the defendant. We have no hesitancy in holding that

the trial court did not abuse its discretion in denying extraordinary costs to General Motors in this case.

For the reasons set forth above the judgment of the district court is affirmed on both the appeal and cross-appeal.