950 F.2d 643
 21 Fed.R.Serv.3d 710, 34 Fed. R. Evid. Serv. 565,
Prod.Liab.Rep. (CCH) P 12,978
 Gilbert J. WERTH and Kathleen L. Werth, husband and wife,
Natural Parents and Legal Guardian of Chris Werth,
a minor, Plaintiffs-Appellants,
v.
MAKITA ELECTRIC WORKS, LTD., an Alien Company, located in
the Country of Japan, and Makita, U.S.A., Inc., a
New York corporation, Defendants-Appellees.
 No. 88-1596.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 25, 1991.
 
 Thomas C. Boone, Hays, Kan., for plaintiffs-appellants.
 Thomas O. Baker of Baker & Sterchi, Kansas City, Mo. (Larry A. Withers of Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., and Evan A. Douthit of Baker & Sterchi, Kansas City, Mo., with him on the brief), for defendants-appellees.
 Before HOLLOWAY and EBEL, Circuit Judges, and KANE*, District Judge.
 HOLLOWAY, Circuit Judge.
 
 
 1
 This appeal is from a judgment, entered on a verdict directed at the conclusion of plaintiffs' evidence, in favor of the defendants-appellees Makita Electric Works, Ltd. and Makita, U.S.A., Inc. (together Makita). The plaintiffs-appellants, Gilbert and Kathleen Werth suing on behalf of their minor son, brought this diversity products liability action in the United States District Court of the District of Kansas.[1] The claims of error focus on the trial judge's exclusion of the proffered testimony of two of plaintiffs' expert witnesses. We agree that rejection of the evidence was error and reverse.
 
 I. THE FACTUAL BACKGROUND
 
 2
 This personal injury lawsuit arises from an accident involving a Makita Model 5007NB, 7 1/4 inch circular saw, manufactured and distributed by Makita. The incident occurred on April 11, 1984, when sixteen year old Chris Werth ("Chris") was cutting wood paneling in the workshop on his family's farm. As developed at trial, Chris was experienced in the use of power tools, including circular saws, having used them at the farm and at school without previous mishap.
 
 
 3
 On the day of the incident, Chris placed a 4' X 8' X 1/8" sheet of paneling over two tables of unequal height, positioned approximately three feet apart, and marked the cut to be made. Using the recently purchased Makita saw, Chris began sawing along the mark. He held the saw in his left hand, and steadied the wood with his right, which was placed to the right of the mark on top of the wood. The paneling was not clamped or otherwise affixed to the tables.
 
 
 4
 After cutting in approximately ten to twenty inches, Chris noticed the paneling was vibrating. While holding the running saw in place with his left hand, Chris shifted his body position and moved his right hand backward to steady the wood. He does not remember where he placed his right hand or exactly what happened next. He does recall, however, that upon resumption of the forward cut, his right hand became "tangled up into" the saw. Chris' brother, Michael, was working nearby outside the workshop. He heard Chris scream and rushed to the workshop. Chris was taken to a hospital where it was determined that his right index and small finger had been completely severed from his hand, and the two fingers between were attached only by strips of skin on the back of his hand. The doctors were only able to reattach Chris' two middle fingers.
 
 
 5
 The complaint against Makita alleges that Makita was negligent in the design, inspection, testing and other manufacturing aspects of the saw (Count I); Makita was strictly liable for Chris' injuries because the circular saw was defective in that it was not equipped with either a blade brake or a riving knife,[2] and because the saw's instruction manual contained inadequate warnings and instructions (Count II), and; Makita breached express and implied warranties (Count III). Following discovery, plaintiffs elected to proceed solely on the strict liability claim in Count II. They alleged a 45% permanent disability to Chris' right hand, and sought medical expenses, lost earnings, compensatory and punitive damages, and costs.
 
 
 6
 By a motion in limine, Makita sought to preclude the testimony of plaintiffs' expert, Gary Robinson, asserting he was not qualified under Fed.R.Evid. 702 to testify on the proper design, function or operation of circular saws, blade brakes, or riving knives. Makita also challenged the adequacy of the factual basis for Robinson's opinion under Fed.R.Evid. 703. The court took this motion under advisement. Similar objections were made to testimony by plaintiffs' other leading witness, Craig Bertolett.
 
 
 7
 In opening argument at the jury trial, plaintiffs' counsel described the accident as resulting from a "kickback" of the saw, caused by a binding of the wood on the rotating blade which forced the sawblade up out of the kurf[3] and into contact with Chris' hand. Counsel contended that installation of either a blade brake or riving knife would have lessened or prevented Chris' injuries. In response, Makita's counsel said that their evidence would show that a kickback could not have occurred under the facts of this case. Specifically, Makita claimed that the type of cut received by Chris (palm-side as opposed to back-of-the-hand) was inconsistent with the view that a kickback occurred. Instead, defendants asserted that the sole cause of the accident was Chris' carelessness in putting his hand under the paneling, where it was exposed to the sawblade. Makita also argued they would show that use of either of the two suggested safety devices would not have prevented the accident.
 
 
 8
 Chris testified about the circumstances of the incident as described above. III R. at 5-112. He could not recall exactly how his hand made contact with the sawblade. Id. at 31, 34. Chris did state that immediately preceding the accident the saw appeared to function normally and that after he started the cut he did not recall anything which suggested that the blade was binding in the wood. He also said that he did not see the saw come out of the kurf. Id. at 91, 111-12. Because he did not remember exactly what happened, he conceded that it was possible that he had placed his hand under the wood when steadying it, as the defense contended. Id. at 109-10.
 
 
 9
 Plaintiffs' witness Pilens, sales manager at a Wichita store selling saws similar to the Makita saw, testified that the vibration of the wood experienced by Chris was the result of a "[b]inding of some sort." IV R. at 82.[4] On cross examination, however, Pilens conceded that neither a blade brake, nor a riving knife, would have prevented a kickback had the binding been at the front of the blade. Id. at 67, 74. He did note, however, that a riving knife could prevent a hand placed under the wood from contacting the rear of the blade. See id. at 98.
 
 
 10
 Plaintiffs' medical expert, Dr. Tyrone Artz, an orthopedic surgeon, testified that Chris suffered an oblique, palm-side cut to his right hand, caused by an all-at-once contact with the sawblade. II R. at 128-30. Plaintiffs next called Chris' brother, Michael, who testified about the conditions of the workshop immediately following the incident, including the location of the severed fingers and the pattern and location of blood he observed. IV R. at 164-177.
 
 
 11
 Plaintiffs then sought to present the expert opinions of Robinson and Bertolett who were to testify that the saw's design was unreasonably dangerous. Makita renewed its objection to the testimony of Robinson and objected to that of Bertolett, asserting both would be merely speculating as to the cause of the accident. Following voir dire of both experts, the trial court refused to let either testify as to the defectiveness of the saw. Plaintiffs then rested, and the court granted Makita's motion for a directed verdict. Plaintiffs' subsequent motion for a new trial was denied. Plaintiffs appeal, asserting errors in the exclusion of their experts' testimony and the direction of a verdict for Makita.
 
 II. DISCUSSION
 A. Timeliness of the Notice of Appeal
 
 12
 We will briefly deal with Makita's claim that the notice of appeal was untimely under Fed.R.App. 3 and 4. The gist of Makita's argument is that plaintiffs' motion for a new trial was defective because it failed to comply with Fed.R.Civ.P. 7(b) and the district court's local rule 206(a). Since a defective motion for a new trial is considered void, Makita argues, the filing of a defective motion for a new trial does not toll the time for filing a notice of appeal, making plaintiffs' April 6 filing untimely.
 
 
 13
 Fed.R.Civ.P. 7(b) requires that a motion shall "state with particularity the grounds therefor, and shall set forth the relief or order sought." In Fine v. Paramount Pictures, 181 F.2d 300 (7th Cir.1950), the court held that an oral motion for a new trial, which was timely made but defective for failing to state any ground for relief with sufficient particularity, did not toll the time for appeal. But see Witt v. Merrill, 208 F.2d 285 (4th Cir.1953) (motion for new trial without assignment of reasons was effective to toll running of time for appeal because trial court entertained the motion and granted leave to file a brief in support thereof).
 
 
 14
 Plaintiffs' motion for a new trial here does state assignments of error concerning its principal claim of error on appeal--the exclusion of the expert's opinions.[5] Makita's assertion that "[t]hese contentions are nothing more than conclusory, general allegations that fail to satisfy the Rule 7(b) requirement" is unconvincing. Although plaintiffs' assignments of error are made in general terms, they clearly state the particular grounds relied on, namely the trial court's refusal to permit two particular experts to testify. Thus the motion sufficiently complies with the requirements of Rule 7(b) to toll the running of the time for appeal. See 2A Moore's Federal Practice, p 7.05 at 7-15, 7-16 (1984) (noting that the particularity requirement is "flexible" and that "reasonable specification is all that the requirement of particularity imposes"); Witt v. Merrill, 208 F.2d 285, 286 (4th Cir.1953) (motion for new trial cannot be deemed a nullity where trial judge entertained it, continued it for arguments, and permitted parties to file briefs addressing it).
 
 
 15
 Makita's second argument is also meritless. Makita says that plaintiffs failed to comply with Local Rule 206(a) by failing to attach a brief or memorandum to the new trial motion, which makes the motion void ab initio. Rule 206(a) of the Rules of Practice of the District of Kansas provides that, with certain exceptions, all motions filed with the clerk
 
 
 16
 shall be accompanied by a brief or memorandum unless otherwise provided in these rules. With the approval of the court, parties may be relieved from the requirement of serving and filing written briefs or memoranda in support of motions, responses and replies.
 
 
 17
 D.Kan.R. 206(a) (1988). Plaintiffs conceded at the hearing on their motion for a new trial that they failed to comply with the local rule. See Tr. 2/24/88 at 2. However, the trial court agreed to and did hear plaintiffs' motion for a new trial and thus relieved plaintiffs of the requirements of Rule 206(a).[6] Makita did not object to the form of the motion or to the court's decision to consider it. Plaintiffs' motion was clearly brought to the attention of the district court, it was opposed by Makita, and it was heard and ruled on at the formal hearing.
 
 
 18
 We hold that the objections to the timeliness of the notice of appeal are without merit.
 
 B. Exclusion of the Expert Testimony
 
 19
 On the merits, plaintiffs argue that the district court erred in excluding the testimony of experts Robinson and Bertolett. Generally a trial judge's ruling on the admission or exclusion of expert testimony will not be overturned unless it is manifestly erroneous or an abuse of discretion. Kloepfer v. Honda Motor Co., Ltd., 898 F.2d 1452, 1458 (10th Cir.1990); Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1517 (10th Cir.1990) (same). We turn to the procedural and then the substantive law relevant to the expert testimony in question here.
 
 
 20
 1. Standards Governing Admission of the Evidence
 
 
 21
 The admission of expert testimony is guided in federal court by the Federal Rules of Evidence, particularly here rules 702 and 703. Rule 702 provides:
 
 
 22
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 23
 Fed.R.Evid. 702.
 
 
 24
 Thus, the "touchstone" of admissibility is helpfulness to the trier of fact. See Breidor v. Sears, Roebuck & Co., 722 F.2d 1134, 1139 (3rd Cir.1983). Moreover, "a lack of specialization does not affect the admissibility of the [expert's] opinion but only its weight," Wheeler v. John Deere Co., 935 F.2d 1090, 1100 (10th Cir.1991), although "a[n expert] witness must have skill or experience in the matter to which the subject relates." Petition of Central Kansas Elec. Co-op, Inc., 224 Kan. 308, 582 P.2d 228, 236 (1978); see also Wheeler, 935 F.2d at 1100 (noting that an expert must "stay within the reasonable confines of his subject area"). As we have noted, "[t]he test expressed in Rule 702--will the expert testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue'--emerges as the central concern of Article VII [of the Federal Rules of Evidence]. Although there were more restrictions on opinion evidence before the enactment of the Federal Rules, helpfulness to the trier of fact was seen then as an essential condition of admissibility." Specht v. Jensen, 853 F.2d 805, 807 (10th Cir.1988) (en banc) (quoting 3 Weinstein's Evidence, p 702 (1985)), cert. denied, 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989).
 
 
 25
 Rule 703, which describes the appropriate bases for expert opinions, provides:
 
 
 26
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 
 
 27
 Fed.R.Evid. 703. Simply stated, this rule lists three bases for expert opinion testimony: 1) the expert may gather information by firsthand observation; 2) the expert may base his or her testimony on facts presented at trial by hypothetical questions of counsel, or facts from evidence before the court; and 3) the expert may rely on facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely on in forming opinions. See Ponder v. Warren Tool Corp., 834 F.2d 1553, 1557 (10th Cir.1987); Ramsey v. Culpepper, 738 F.2d 1092, 1101 (10th Cir.1984). Moreover, as we noted in Ponder, expert testimony on causation "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Id. at 1557 (quoting Fed.R.Evid. 704).
 
 2. The Substantive Kansas Law
 
 28
 Under the governing law of Kansas,[7] to establish a prima facie strict liability case plaintiffs must prove three elements: "(1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control." Mays v. CIBA-Geigy Corp., 233 Kan. 38, 661 P.2d 348, 360 (1983). As further explained by the Kansas Supreme Court:
 
 
 29
 These elements may be proven inferentially, by either direct or circumstantial evidence. For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective. Because liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility.
 
 
 30
 Id. (emphasis added).
 
 
 31
 Here, as plaintiffs' counsel conceded in his opening argument, and as shown by subsequent testimony, Chris was the only witness to the incident and he was unable to remember some of the details himself. See II R.Doc. 79 at 72; III R. at 31, 34. Therefore, as to the first element of plaintiffs' case, plaintiffs offered circumstantial evidence and the testimony of the experts, along with Chris' testimony, to show that a defect in the Makita saw caused Chris' injuries. See, e.g., Campbell v. Clark, 283 F.2d 766, 770 (10th Cir.1960) (reconstruction used when injured plaintiff was the sole witness and could not recall details).
 
 
 32
 We turn to the district court's rejection of the testimony of each expert in turn.
 
 Gary Robinson
 
 33
 Plaintiffs first called Gary Robinson as an expert witness, who was hired to investigate the accident. Robinson testified extensively about his qualifications, recounting his education and his experience as a safety consultant.[8] Robinson testified that his investigation of the instant case involved a visit to the Werth farm, where he inspected and photographed the workshop and the saw, and interviewed the Werth family, including Chris. V R. at 41-49.
 
 
 34
 At this point, plaintiffs' counsel posed two questions to Robinson, the first, calling for his expert opinion whether the Makita saw met "good guarding principles," and the second, asking whether the saw had a "defect in its design which rendered it unreasonably dangerous to the user?" V R. at 75-76, 77. Defense counsel objected to both questions. During the subsequent voir dire, the trial judge asked Robinson how he defined the concept of "unreasonably dangerous." Robinson responded: "I define it if the risk can be reduced to an acceptable level, and if it is not, then it's unreasonably dangerous from a safety standpoint. Acceptable level means within technology, cost effectiveness and its effect on production." V R. at 78. Following this answer, Robinson was barred from giving further expert testimony in this case.
 
 
 35
 The trial court cited two reasons for excluding Robinson's testimony. First, the court noted that he would not permit Robinson to testify because "the test that Mr. Robinson has tendered is not the [strict liability] test of Kansas." V R. at 78. The court explained that under Kansas law, a product is unreasonably dangerous "if it is dangerous to the extent beyond that which would be contemplated by [an ordinary] ... consumer." Id. The court cited Lester v. Magic Chef, 230 Kan. 643, 641 P.2d 353 (1982), as authority for its conclusion that the proper test in Kansas is the "consumer-expectation" test. V R. at 111. Second, the court barred Robinson's testimony because he was not qualified to "reconstruct" the accident in that he had failed to conduct independent testing of the saw and material when given the chance at the Werth farm and later. See id. at 83-84. The court held that without independent tests, Robinson's testimony would be "speculative," and thus, was inadmissible. Id. Specifically, the judge ruled:
 
 
 36
 [N]otwithstanding whatever qualifications [Robinson] has and his interest in the safety standards or guarding, he's really here to reconstruct what happened.... I will sustain the objection as to the admissibility of the witness's [sic] testimony because other than that is to ask this Court and this jury to speculate.
 
 
 37
 My reasons for this are that Rule 704 or 702 is [sic] that I should permit a witness to testify as an expert if his scientific, technical or specialized knowledge will assist the trier of fact, the jury here, to understand the evidence or to determine a fact in issue.... [I]t's my policy and practice that expert witness's [sic] should not be permitted to speculate as to what happened when they had the opportunity to test that thesis and have not done so. That's the case here. This witness then must first establish what happened. First part of your question is based on how this happened, and to tell us here how it happened is speculation. So, I will sustain the objection.
 
 
 38
 Id. at 83-84 (emphasis added).
 
 
 39
 We believe the court abused its discretion in excluding Robinson's answers to the propounded questions, despite its correct appraisal that the consumer-expectation test governs in Kansas. See Magic Chef, 641 P.2d at 357, 361; Barnes v. Vega Indus., Inc., 234 Kan. 1012, 676 P.2d 761 (1984); Betts v. General Motors Corp., 236 Kan. 108, 689 P.2d 795, 801 (1984). Although the court properly intercepted Robinson's initial testimony which was based upon the wrong legal standard, see, e.g., Karns v. Emerson Electric Co., 817 F.2d 1452, 1459 (10th Cir.1987) (expert's use of legal terms must not conflict with the court's instructions), we find no support for the continued rejection of Robinson's testimony since counsel corrected his questions, using the right legal standard. See, e.g., Lawrence v. Texas, 457 S.W.2d 561, 562 (Tex.Crim.App.1970) (noting that "where a question has been improperly put, counsel may propound a proper question free from the defects in the former question").
 
 
 40
 During the subsequent offer of proof, plaintiffs' counsel specifically described to Robinson Kansas' "consumer-expectation" test and asked Robinson whether he had an opinion about the saw's defectiveness under that test. V R. at 103-04. Robinson opined that he still found that the saw was "unreasonably dangerous." Id. at 103. Nevertheless, the court again refused to permit him to testify, stating that he would not allow Robinson "to roll with the caselaw and somehow make your conclusions" under the correct legal standard. V R. at 112.
 
 
 41
 Certainly, the court, and not an expert, instructs the jury on the proper legal standard to apply. See Specht, 853 F.2d at 807 (noting that "it is axiomatic that the judge is the sole arbiter of the law and its applicability"). However, the correct legal standard having been identified, and an inquiry having been made thereunder about the saw based on the relevant circumstances, we cannot sustain the trial judge's refusing to admit the testimony proffered under the right standard. In the absence of any showing of misconduct or misrepresentation by either plaintiffs' counsel or Robinson, the court erred by rejecting the plaintiffs' proper offer of proof under Kansas law.
 
 
 42
 As to the court's second reason to exclude Robinson's testimony, the question which the ruling raises is whether a per se rule exists which requires an accident reconstruction expert to conduct independent tests before an opinion on causation is admissible. No authority supporting such a rule was cited and we find none. We hold that it was error for the district court to have imposed such a requirement of independent tests.
 
 
 43
 In Wylie v. Ford Motor Corp., 502 F.2d 1292 (10th Cir.1974), a diversity products liability case, plaintiff presented the testimony of an expert physicist in order to explain why his automobile went out of control, crashing and injuring him. The expert testified that he believed the car's control arm was defective because the ball joint had abnormally worn down, permitting the ball to separate from the socket and causing the accident. Despite this testimony, the district court directed a verdict for Ford. We reversed. Although the context of the Wylie decision differs slightly from the present case, in reversing the district court's grant of a directed verdict, we held that the expert's failure to conduct independent tests went only "to the weight which the trier of fact should accord the evidence and [did] ... not make the testimony incredible." Id. at 1294. Thus, in Wylie, we accepted the view that otherwise relevant, factually related expert opinion evidence could support a products liability claim despite the fact that the expert did not conduct independent tests. Fed.R.Evid. 703, cited by the district court, makes no mention of a requirement of independent tests. Rather, Rule 703 and Rule 704 clearly contemplate an "opinion," and not only a recitation of facts observed from independent testing. See, e.g., Lollis v. Superior Sales Co., Inc., 224 Kan. 251, 580 P.2d 423, 428 (1978) (expert opinion reconstructing accident especially helpful where there are no eyewitnesses).[9]
 
 
 44
 As shown during an oral proffer made immediately following the court's ruling, Robinson identified three possible scenarios which could have resulted in the accident. The first was plaintiffs' primary theory of kickback; the second, was defendant's theory that Chris simply put his hand under the paneling and hit the back of the blade; and the third, that "the material itself might have gone forward, leaving the saw stationary, and, therefore, his hand being on the material would come in contact with the rear of the blade." V R. at 101-02.
 
 
 45
 In support of the trial court's ruling, defendants contend Robinson's opinion was properly deemed "speculative" because he could not identify which of the three scenarios actually happened. See Appellee's Brief at 10. However, as we read the record, Robinson's theory of defectiveness was based on a clear probability of what happened in that no version of events other than these three was ever argued to have occurred. As Robinson later noted in the proffer: "if a riving knife had been on [the Makita saw] it[ ] would have been, in fact, a barrier and the accident wouldn't have happened, no matter which of the three reconstructions occurred." Id. at 108 (emphasis added). Thus, Robinson's expert opinion on the defectiveness of the saw was based on three permissible views of what happened, all consistent with the evidence presented.
 
 
 46
 Under Kansas strict liability in tort principles, the question is whether the inference of causation is too speculative. See CIBA-Geigy, 661 P.2d at 360; Siruta v. Hesston Corp., 659 P.2d 799, 805-06 (Kan.1983) (holding that a reasonable inference that a machine belt broke and pulled plaintiff into the machine could support expert testimony on the defectiveness of the machine even though "[i]t all happened so fast that plaintiff could not remember exactly how it happened but that is his recollection"). The evidence presented at trial here made the three possibilities mentioned by Robinson the only three legitimate inferences. As shown by the proffer, Robinson's opinion on the defectiveness of the saw was the same regardless of which of the three actually occurred. Having expressed his opinion based on the implicit elimination of any other possible causes, Robinson should have been permitted to respond if his opinion would have assisted the jury. See, e.g., Farmer's Insurance Co. v. Smith, 219 Kan. 680, 549 P.2d 1026, 1032-34 (1976) (investigator's opinion that fire was caused by a defective loose connection should have been admitted despite his inability to physically find the connection where he formed this opinion by process of elimination); Breidor, 722 F.2d at 1138-39 (noting that "[w]here there is a logical basis for an expert's opinion testimony, the credibility and weight of the testimony is to be determined by the jury, not the trial judge"). Because the jury did not have Robinson's knowledge of industrial safety practices and standards concerning circular saws, his testimony would have been helpful and should have been admitted under the test of Rule 702. See Specht v. Jensen, 853 F.2d at 807.
 
 
 47
 In addition to explaining the three ways the accident could have occurred, Robinson's testimony was also offered to support plaintiffs' claim of defective design under a "failure to guard" theory. As Robinson stated in the proffer:
 
 
 48
 It's a machine guarding case because I believe basically this case is a riving knife case. The purpose of a riving knife is two-fold: One, to eliminate or reduce the possibility of kickback. Secondly, and just as importantly, it acts as a barrier guard between the rear of the blade where most of the accidents occur and the operator, and placing a barrier in the rear of the circular saw in the form of a riving knife is, in fact, a machine guarding principle and concept.
 
 
 49
 V R. at 106.
 
 
 50
 This court has recently noted, "[w]hile under the Federal Rules of Evidence a district court has substantial discretion in deciding which experts can and cannot testify, the district court may not employ this discretion to restrict viable and relevant theories offered by a party." Graham v. Wyeth Laboratories, 906 F.2d 1399, 1408-09 (10th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 511, 112 L.Ed.2d 523 (1990). Both the "failure to guard" and kickback theories supported plaintiffs' strict liability claim and could properly be used to prove that claim. Therefore, under Wyeth Laboratories, the exclusion of Robinson's testimony cannot be considered harmless. In sum, we are convinced that the trial judge erred in excluding Robinson's testimony and abused his discretion by so doing.
 
 Craig Bertolett
 
 51
 Plaintiffs also offered the expert testimony of Craig Bertolett, a consulting engineer who had worked extensively in the design and development of hand-held circular saws, and who had experience in reconstructing the kickback phenomenon. VI R. at 4-21, 65.[10] Like Robinson, Bertolett had gone to the Werth farm following the accident. Bertolett examined and photographed the workshop and the saw, and interviewed the family. See id. at 25-29, 38-49.
 
 
 52
 Bertolett's expert opinion was tendered as a means of explaining how Chris' injury occurred. As Bertolett testified, "I asked [Chris] to help me reconstruct the accident at the site." Using the same workshop tables and a facsimile sheet of wood, Bertolett and Chris "very deliberately arranged the saw, the table [sic] and photographed the situation." Id. at 29. Bertolett also interviewed both Chris and his brother to determine the location of the severed fingers and the blood splashes. Id. at 47-49.
 
 
 53
 After developing Bertolett's technical experience and his study of the kickback phenomenon, plaintiffs' counsel asked: "Do you have an opinion, sir, as to what happened to Chris Werth when he was in the progress [sic] of the cutting of his plywood when he lost his fingers?" Defense counsel immediately objected on the bases of relevancy and that the question "calls for speculation." VI R. at 71. Voir dire followed. During the voir dire, Bertolett conceded that he did not know exactly how the binding took place. Id. at 73. He also stated that although he had plugged in and started the Makita saw at the Werth farm, he did not run any tests or cut wood with that saw. Id. at 74-75.
 
 
 54
 After the voir dire and the arguments of counsel, the judge stated, in relevant part:
 
 
 55
 At best we know from Chris Werth that he doesn't know what happened.... He did testify that he did not recall anything unusual happening with regard to the saw, nor did he recall a kickback.
 
 
 56
 Now, having said that, there isn't much that any witness can draw upon to tell us what did happen. You're asking this witness to tell this jury what did happen. This witness has been to the scene, this witness is shown to have expertise in circular saws, and has expertise apparently as to the causes of kickback. And this witness was permitted the opportunity to simulate all the events that transpired, including the use of the tables, the placement of the board on the table, and he did that. But the one thing that is clear to me he did not do was simply to turn on the saw and put to the test what happens ones [sic] he commences to saw into the wood.
 
 
 57
 I would insist that he test that thesis, and to do anything other than that, ..., is to speculate, and, in my view his testimony is speculation and to reach an opinion as to what happened as you have asked him would be no more than speculation.
 
 
 58
 Id. at 83-84 (emphasis added). Immediately before plaintiffs' subsequent proffer of Bertolett's testimony, the court further elaborated:
 
 
 59
 All I can say is as of this moment this witness is not shown to know what happened, other than, in my view, to speculate.... [I]t's because of my own problem with experts who are willing to postulate as to what they think happened once they are aware that they needn't rely upon the evidence at hand to draw that opinion, and I'm absolutely satisfied that given the opportunities to inspect and test their thesis, as legitimate experts ought to do, the answers are ofttimes are quite different. When they have at hand the opportunity here to put to the test their thesis and don't do so, in my view then they are not going to meet the [Fed.R.Evid.] 703 test if that question is somehow to be helpful to the jury[.]
 
 
 60
 Id. at 90-91 (emphasis added).
 
 
 61
 The underscored passages show that as with Robinson, Bertolett was precluded from testifying by the trial judge's application of an erroneous, per se rule requiring independent testing for accident reconstruction. On the authorities and reasoning relied on earlier, we are convinced that the judge erred in imposing such a precondition to the expert testimony.
 
 
 62
 We have considered the circumstances on which Bertolett's proffered testimony was based. During the proffer, Bertolett explained what facts he used to support his opinion that a kickback occurred:
 
 
 63
 (By plaintiffs' counsel)
 
 
 64
 Q: Was the blood significant to you in determining whether or not a kickback occurred?
 
 
 65
 A: [W]here the blood was indicated that the cut took place above the workpiece.
 
 
 66
 Q: Above the plywood?
 
 
 67
 A: Yes. And, therefore, by the definition of kickback, the accident took place with the blade above the work piece.
 
 
 68
 Q: Why is the blood relevant in that regard?
 
 
 69
 A: The blood was at the end of the kurf on top of the board, which means it was thrown. The fingers--none of them were underneath the board; therefore, they were thrown away, and one of them was thrown forward, which is consistent with the direction of the blade, and was thrown some great distance, not downward. That indicates to me another reason that it was that way.
 
 
 70
 Q: Above the work piece?
 
 
 71
 A: Yes, right. The splattering on the wall indicated that might have actually rotated the thing....
 
 
 72
 Q: Concern you that Chris Werth doesn't remember any evidence of a kickback?A: [H]e sure as hell has in mind that his hand was entangled, and where the blood was and where the fingers were clearly indicate the accident was above the work piece.
 
 
 73
 Id. at 95-97 (emphasis added).
 
 
 74
 We cannot agree with the trial judge that such testimony should have been rejected as speculative. As noted in the proffer, Bertolett's analysis and his conclusion on kickback rested on facts already in evidence--how the workpiece was set up, where the blood was splattered, and where the fingers were thrown. Such data clearly satisfied Rule 703 on the bases for opinion testimony. Bertolett learned these facts when he interviewed Chris and Michael at the farm, and they were presented at trial when Michael testified. We cannot agree that it was impermissible speculation for Bertolett, with his qualifications, to form an opinion on the probable causation from his analysis of the facts indicating where the blood and fingers were thrown by the saw.
 
 
 75
 Moreover, the doubts suggested by the trial judge concerning the sufficiency of the factual basis to support Bertolett's opinion go to its weight, and not to its admissibility. See, Quinton v. Farmland Indus., Inc., 928 F.2d 335, 337-38 (10th Cir.1991) (though doctor's factual knowledge was not "as complete as it might have been" it was "sufficiently detailed ... to permit his expression of an opinion as to the cause of the damages allegedly incurred"). Here the trial judge found Bertolett to have expertise on both circular saws and the causes of kickback. VI R. at 83. Such expertise necessarily subsumes some knowledge of how objects contacting a moving circular saw blade would react and where they would be thrown.
 
 
 76
 Given the technical nature of the kinetic principles involved, we are persuaded that the testimony would have been helpful and should have been admitted for the jury to weigh under Rule 702. See Specht v. Jensen, 853 F.2d at 807. The exclusion of the critical testimony of the experts, Robinson and Bertolett, created an undue hardship, affecting plaintiffs' substantial rights. See Graham v. Wyeth Laboratories, 906 F.2d at 1408-09 (exclusion of viable and relevant theory offered by a party affects the party's substantial rights).
 
 
 77
 We hold that the exclusion of the testimony of these expert witnesses was an abuse of discretion and error. Since those rulings led to the directed verdict and the judgment for the defendants, that judgment must be REVERSED and the case must be REMANDED for a new trial.
 
 
 
 *
 Honorable John L. Kane, Jr., Senior United States District Judge for the District of Colorado, sitting by designation
 
 
 [1]
 Defendant-appellee Makita Electric Works, Ltd. is a Japanese corporation located in Anjo, Japan. Defendant-appellee Makita, U.S.A., Inc., is a New York corporation with its principal place of business in New York. Plaintiffs-appellants are citizens of Kansas
 
 
 [2]
 A "blade brake" is designed to quickly slow and stop the rotation of the circular saw blade after the saw's trigger is released. See IV R. at 59. A "riving knife" is a thin, wedge-shaped metal attachment to the rear of the saw which follows the blade through the cut made by the saw in the wood. See id. at 68, 75
 
 
 [3]
 The "kurf" is a technical name for the cut made by the saw in the wood. II R. at 71
 
 
 [4]
 On cross examination of Pilens, the court permitted defense counsel to treat him as an expert on circular saws due to his former experience as a power tool repairman. See IV R. at 57-81, 89
 
 
 [5]
 The motion states in part:
 
 
 [1]
 That the Court erred when it sustained the objections of the Defendants to the opinions of Gary Robinson and Craig Bertolett, the Plaintiff's two experts herein for the reason that said ruling is contrary as it [sic] dictates to Federal Rules of Evidence 702, 703 and 704. In support of this motion for new trial ... Plaintiff submits the written proffer filed herein by the Plaintiff, ... and the sworn testimony of Gary Robinson ... [and of] Craig Bertolett proffered after the Courts [sic] ruling on the same date, and
 
 
 [2]
 Plaintiff further urges a new trial for the reason that in analyzing the Court's ruling on Gary Robinson and Craig Bertolett, the Court was in effect, as part of its ruling herein, literally sustaining a motion to dismiss on the grounds that the Plaintiff was guilty of contributory negligence contrary to dictates of K.S.A. 60-258(a)
 I R.Doc. 60 at 1-2.
 
 
 [6]
 After plaintiffs' counsel, Mr. Boone, advised the judge that he had filed "a motion without a memorandum," the following dialogue occurred:
 The Court: That's what I had.
 Mr. Boone: I think--well--
 The Court: It suffices for the purpose of --
 Mr. Boone: I understand.... I think we all know what the issues are, what my position is, ....
 Tr. 2/24/88 at 2 (emphasis added).
 
 
 [7]
 To the extent that any of the trial judge's rulings were based on the law of Kansas, we review those state law rulings de novo. See Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991)
 
 
 [8]
 Robinson, a Michigan State University graduate, testified about his expertise in power tool safety, stating that he had served approximately 15 years as the president of two safety consulting firms. He also recounted his five-year experience as the Safety Director for the Pontiac Motors Division of General Motors Corporation, and his seven years' work as a safety engineer for GMC and two insurance companies. See V R. at 4-26
 Although the defendants asserted in their in limine motion that Robinson lacked sufficient educational or professional qualifications to offer his opinion on the saw's defectiveness, see I R.Doc. 45 at 3, the record clearly shows that the trial court did not exclude Robinson's testimony on this basis. Plaintiffs' counsel specifically asked the court about this objection following the ruling on Robinson, to which the court replied: "I would think that Mr. Robinson has considerable expertise in safety analysis and in the safeguardings [sic] of appliances or equipment or tools. That's not the reason I entered my findings." V R. at 85.
 
 
 [9]
 Under Kansas law, expert testimony on the defectiveness of a product is not preconditioned on "establish[ing] what happened," as the trial judge said here in rejecting Bertolett's testimony. The Kansas court has noted that such a cause of action may be proved by circumstantial evidence which need not rise to the level of certainty of excluding any and every other reasonable conclusion. It is proper to use expert testimony to prove causation, provided that the expert's opinion is based on adequate facts and not upon evidence which is too uncertain or speculative. See Mays v. CIBA-Geigy Corp., 661 P.2d at 360. "[T]he circumstances shown must justify an inference of probability as distinguished from mere possibility." Id. 661 P.2d at 360
 We also note that the same expert involved in this case, Gary Robinson, has testified on causation in another products liability case that eventually reached the Kansas Supreme Court. See Siruta v. Hesston Corp., 232 Kan. 654, 659 P.2d 799 (1983). Siruta is similar to the instant case in that the plaintiff there, as here, was unable to recall exactly what caused the accident. The Kansas Supreme Court found Robinson qualified to testify on both defectiveness and causation, noting that his opinion was adequately based upon the plaintiff's statement and an inspection of the machine at issue. See id., 659 P.2d at 807.
 
 
 [10]
 Bertolett's impressive qualifications include graduate degrees in mechanical engineering (New Mexico State University), business administration (Loyola College, Maryland), and a bachelor's degree from the United States Military Academy at West Point, and extensive experience. He was employed at Black & Decker for six years, serving as Project Engineer, Manager of Resident Engineering, and then Director of "Test and Evaluation." At Black & Decker, he supervised the design, design changes, and testing of products, including circular saws. Bertolett also worked four years as Vice President of Engineering for the Special Products Division of Emerson Electric Company before forming his own engineering consulting firm in 1980. VI R. at 4-21